**Lyskoski WASHINGTON, Plaintiff,**

v.

**Dr. Gershon SILBER, et al., Defendants.**

**Civ. A. No. 91–0085–R.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Nov. 3, 1992.

Fred Rowlett, pro se.

L. Thompson Hames and Merrimon B. McAdam, Roanoke, Va., Gayl Branum Carr, Richmond, Va., for defendants.

## MEMORANDUM OPINION

WILSON, District Judge.

This is an action under 42 U.S.C. § 1983 by plaintiff, Lyskoski Washington, who, while being held pursuant to a judgment of conviction, was temporarily committed to the Marion Correctional Treatment Center, in Marion, Virginia, by the Chief Judge of the General District Court of Brunswick County, Virginia. The judge determined that Washington had "been proven to be so seriously mentally ill as to be substantially unable to care for himself" and was "incompetent or incapable, either mentally or physically, of giving informed consent" to treatment in his "best interests." Washington complains that the forced administration of antipsychotic drugs during his temporary confinement in the Marion Treatment Center violated his rights to substantive and procedural due process. Following a hearing under 28 U.S.C. § 636, the United States Magistrate Judge, in a thoughtful report, concluded that Washington's rights to substantive and procedural due process had been violated and recommended that damages be imposed against Dr. Gershon Silber, the doctor who administered the drugs. The magistrate judge also expressed concerns about the constitutionality of the Virginia statutory scheme that permits forced medication of prisoners. The matter is before the court on Silber's objection to the magistrate judge's report.[1] The court finds that Washington was deprived of neither substantive nor procedural due process and declines to make unnecessary sweeping constitutional pronouncements concerning Virginia's statutory scheme.

### I.

Washington has a history of substance abuse as well as psychotic and antisocial behavior. He has been sentenced to prison

---

1. The magistrate judge also recommended that judgment be entered in favor of the warden of the Marion Correctional Treatment Center. There were no objections to that aspect of the report, and it will not be considered further.

for crimes of violence and has been institutionalized for schizophrenia. He is 39 and has used drugs including heroin, cocaine, marijuana, and LSD since he was 16. His family has considered him physically threatening at times, and, during an earlier psychiatric hospitalization, a knife was found in his room. He has also severely injured himself. On one such occasion he dropped a fifty pound weight on his penis.

In 1990 Washington was convicted in Culpeper County, Virginia of uttering a forged check. An official at the Culpeper County Jail reported that Washington was acting bizarrely, including "wrap[ping] his penis in something everyday, talk[ing] to imaginary people, [and] put[ting] lighted matches under his scrotum to get rid of crabs." On October 24, 1990, he was transferred to the Brunswick Correctional Center.

On November 1, 1990, a psychologist at Brunswick signed two petitions under oath and filed them in the General District Court of Brunswick County. One petition sought a commitment order, stating that Washington was "mentally ill and in need of involuntary admission to a correctional psychiatric facility." The other sought authority to involuntarily medicate Washington, stating that Washington was "physically and/or mentally incompetent to or incapable of giving informed consent" to proposed treatment that was in Washington's "best interest." Affidavits of Dr. R.P. Degala, a licensed psychiatrist who personally examined Washington on November 1, 1990, were filed in support of the petitions. According to those affidavits, Washington had the following symptoms: "paranoia, delusions, hallucinations, loose associations, bizarre behavior, poor self care, impaired judgment, grandiose [sic], [and] difficulty concentrating." The affidavits concluded that Washington was "an imminent danger to himself" and was "so severely mentally ill as to be substantially unable to care for himself."

In accordance with the requirements of Virginia law, the general district judge appointed counsel to represent Washington and held a hearing on the petitions. The judge found that Washington had "been proven to be so seriously mentally ill as to be substantially unable to care for himself." He equivocated, however, as to whether he found Washington to be an imminent danger to himself; he placed a check on a form commitment order indicating that he found Washington to be an imminent danger to himself, but placed a question mark next to that check. The judge concluded that there were "no less restrictive alternatives to involuntary admission," and he involuntarily admitted Washington to a licensed Department of Corrections facility for "care and treatment for a period not to exceed 180 days." He also found that Washington was "incompetent or incapable, either mentally or physically, of giving informed consent" to treatment and authorized involuntary "medication as required." Virginia provides for a *de novo* hearing in the circuit court with the attendant right to a jury trial. Washington, however, did not appeal either the involuntary admission or the treatment order.

At the beginning of Washington's stay at Marion, the medical team assigned to work with Washington questioned whether he was malingering. Silber decided initially to treat Washington without antipsychotic drugs, despite evidence that Washington had improved in the past with their help. The medical records indicate that, until early January 1991, Washington's condition was controlled fairly well without antipsychotic drugs, or at least relatively well considering his substantial medical history. By January 9, however, Washington had again begun to behave bizarrely, wrapping tinfoil on his teeth, wrapping his penis in plastic, and tying his scrotum with a shoestring. In light of Washington's medical history and his rapidly deteriorating condition, Silber concluded that Washington should be medicated. On January 10, Washington was involuntarily medicated with haldol over Washington's "angry objections."

Washington filed a grievance complaining that he had been involuntarily medicated, and the administration responded that Washington was "involuntarily committed

at Brunswick Correctional Center for both medication and treatment." Washington, in turn, appealed to the superintendent who denied the appeal essentially for the same reason. Following Silber's directives, the medical staff continued to medicate Washington periodically until April 1991, when the judge's involuntary commitment order expired.

Washington filed suit in this court challenging Silber's actions. The matter was referred to the magistrate judge for a hearing, and counsel was appointed to represent Washington. Following the hearing, the magistrate judge filed a report of her findings and recommendations. According to the report: the general district judge made "no clear decision" that Washington was dangerous; even if the judge had found Washington dangerous for commitment purposes, that finding would have been "insufficient to satisfy a determination that [Washington was] dangerous for purposes of involuntary medication;" and Silber did not make "an independent finding" on January 9, 1991, that Washington was dangerous. Therefore, the report continues, Silber violated Washington's substantive due process right to refuse antipsychotic drugs, a right that could not be overcome unless Washington was found to be dangerous and forced medication was found to be in his best medical interest. Procedural due process also was violated, according to the report, because "Washington received no due process hearing on or about January 10, 1991, the date he was actually medicated."

## II.

■ Although the benefits of antipsychotic drugs are numerous, they can have serious side effects. Thus, treatment of the mentally ill prison inmate with antipsychotic drugs against his will implicates both substantive and procedural due process. *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990); *U.S. v. Charters,* 863

F.2d 302, 305–06 (4th Cir.1988) (en banc). However, the court finds that neither was violated in this case. Before addressing the magistrate judge's due process concerns, the court reviews the provisions of the Code of Virginia that govern involuntary admission and involuntary medication orders.

The involuntary admission of mentally ill prisoners in Virginia is governed by Code of Virginia § 53.1–40.2. The admission procedure begins when the director of the Department of Corrections, or his designee, files a petition in the general district court of the county or city where the prisoner is located. Va.Code Ann. § 53.1–40.2.A. (Michie 1991). The hearing must be set "as soon as possible," allowing the prisoner an opportunity to prepare his defense, obtain an independent evaluation and expert opinion, and summons witnesses. Va.Code Ann. § 53.1–40.2.B.1. (Michie 1991). Prior to the hearing the judge is required to inform the prisoner of the allegations of the petition, "the standard upon which he may be admitted involuntarily," and his right to appeal to the circuit court.[2] The judge is then required to appoint counsel if the prisoner is unrepresented and have the prisoner examined by a licensed psychiatrist or clinical psychologist or, if neither is available, by a physician or psychologist "qualified in the diagnosis of mental illness." Va.Code Ann. §§ 53.1–40.2.B.2. to .B.3. (Michie 1991). The judge must then summons the examiner who is required to certify whether or not the prisoner presents "an imminent danger to himself or others" and whether or not the prisoner requires "involuntary hospitalization." If there is no objection, the judge may, in lieu of the examiner's appearance, "accept written certification of the examiner's findings if the examination has been personally made within the preceding five days." Va. Code Ann. § 53.1–40.2.B.3. (Michie 1991). "[A]fter observing the prisoner and obtaining the necessary positive certification,"

2. The constitutional standard of proof for involuntary admissions is clear and convincing evidence. *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). There is no reason to conclude that the courts of the Commonwealth of Virginia are not applying that standard of proof.

the judge may "order that the prisoner be placed in a hospital or other facility designated by the Director for a period not to exceed 180 days" if the judge finds that:

> (i) the prisoner presents an imminent danger to himself or others as a result of mental illness, or has been proven to be so seriously mentally ill as to be substantially unable to care for himself, and (ii) alternatives to involuntary admission have been investigated and deemed unsuitable and there is no less restrictive alternative to such admission....

Va.Code Ann. § 53.1–40.2.B.4. (Michie 1991).

The procedures authorizing treatment of mentally ill prisoners follow a similar pattern beginning with the petition. Those procedures are detailed in Code of Virginia § 53.1–40.1. At the hearing, the judge hears evidence "concerning the prisoner's condition and proposed treatment." The judge may order treatment, which may include antipsychotic medication, if he finds clear and convincing evidence "that the prisoner is incompetent or incapable, either mentally or physically, of giving informed consent to such treatment and that the proposed treatment is in the best interest of the prisoner." *See* Va.Code Ann. § 53.1–40.1.A. (Michie 1991). The prisoner may appeal the treatment order *de novo* to the circuit court, and the circuit court's order is, in turn, appealable to the court of appeals, which is required to give the appeal priority on its docket. Va.Code Ann. § 53.1–40.1.D. (Michie 1991).

### A. Substantive Due Process

Substantive due process precludes the involuntary confinement of the mentally ill "if they do not pose some danger to themselves or others." *Addington v. Texas,* 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). *Accord O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). Similar due process concerns led to the Supreme Court's holding in *Washington v. Harper* that a prison inmate may not be medicated with antipsychotic drugs against his will unless "the inmate is dangerous to himself or others and the treatment is in the inmate's best interest." 494 U.S. 210, 227, 110 S.Ct. 1028, 1040, 108 L.Ed.2d 178 (1990).

In the present case, the general district judge found, pursuant to Code of Virginia § 53.1–40.2., that Washington was "substantially unable to care for himself" and that there were "no less restrictive alternatives to involuntary admission." Although these findings were technically made in connection with the petition for involuntary admission, the standards applied were sufficient under the substantive due process requirements for involuntary medication. *See Id.*[3] The magistrate judge concluded, however, that because the general district judge equivocated as to whether Washington was "an imminent danger to himself," there were insufficient findings of dangerousness to satisfy substantive due process. That conclusion assumes that the general district judge's unequivocal findings that Washington had "proven to be so seriously mentally ill as to be substantially unable to care for himself," and that there were "no less restrictive alternatives to involuntary admission," were insufficient to satisfy substantive due process. The court disagrees with that assumption.[4]

---

**3.** In concluding that "the determination that a prisoner ... [is] subject to involuntary commitment in a mental hospital does not satisfy a determination that the prisoner is a danger to himself or others for purposes of an involuntary medication order," the magistrate judge seemed to suggest that there are different due process standards of dangerousness—one for commitments and one for the forced administration of antipsychotic drugs. *Washington v. Harper* suggests no such distinction. To the contrary, there was a single definition of dangerousness for commitments and for the forced administration of drugs in *Washington v. Harper,* and that

definition survived scrutiny. *See* 494 U.S. at 215 n. 3, 110 S.Ct. at 1033, n. 3.

**4.** In *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, Walter Harper was confined at a State of Washington correctional facility established to treat convicted felons with serious mental disorders. Harper was diagnosed as suffering from a manic depressive disorder but refused antipsychotic medication prescribed by his treating physician. The facility's policy permitted involuntary treatment with antipsychotic medication if the mentally ill inmate was "gravely disabled" or posed a "likelihood of serious harm" to himself or others. The language

At one end of the spectrum of mentally ill persons who are "dangerous" are those who, left untreated or unrestrained, would probably commit a self destructive or violent act. At the other end of the spectrum are those persons who, because of mental illness, are incapable of making judgments as to avoid serious bodily harm to themselves or others. As one court has articulated:

> A finding of dangerousness indicates the likelihood that the person to be committed will inflict serious harm on himself or on others. In the case of dangerousness to others, this threat of harm comprehends the positive infliction of injury— ordinarily physical injury, but possibly emotional injury as well. In the case of dangerousness to self, both the threat of physical injury and discernible physical neglect may warrant a finding of dangerousness. Although he does not threaten actual violence to himself, a person may be properly committable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable.

*Lynch v. Baxley*, 386 F.Supp. 378, 391 (M.D.Ala.1974), *rev'd on other grounds*, 651 F.2d 387 (1981). *See Colyar v. Third Judicial District*, 469 F.Supp. 424, 430–31

(D.Utah 1979). Therefore, a person who is "so seriously mentally ill as to be substantially unable to care for himself" and who is not amenable to treatment without confinement is literally dangerous to himself. In the words of the Supreme Court:

> [E]ven if there is no foreseeable risk of self-injury or suicide, a person is literally "dangerous to himself" if for physical or other reasons he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends.

*O'Connor v. Donaldson*, 422 U.S. at 574 n. 9, 95 S.Ct. at 2493 n. 9. It is clear that Washington's condition fell well within those parameters both at the time he was committed and at the time he was actually medicated and that requisite findings of dangerousness were made by the judge who committed Washington and authorized involuntary medication and by Silber who injected Washington with Haldol.[5]

In addition to the finding that the inmate is dangerous, substantive due process requires the finding that "the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. at 227, 110 S.Ct. at 1040. Code of Virginia § 53.1–40.1. requires that finding as well, and the general district judge made the finding before he authorized treatment. Pursuant to that authorization, Silber injected Washington with Haldol to prevent Washington's condition from deteriorating further. Substantive due process requires no more.[6]

---

of the Virginia statute permitting the involuntary commitment of a prisoner who is "so seriously ill as to be substantially unable to care for himself" is no less rigorous than the "gravely disabled" standard that survived scrutiny in that case.

5. There is some conflict in the record as to whether Washington had become assaultive while at Marion. At the hearing before the magistrate, Silber testified about events that are not chronicled in Washington's medical records at Marion. There is no real conflict, however, that Washington has a long history of mental illness; that he has exhibited signs of dangerousness in the past; that he has a long history of substance abuse; that he acted in the bizarre fashion detailed in his medical records; that the psychiatrist who examined Washington at Brunswick found that he was suffering from

paranoia, delusions, and hallucinations, that at least by January 9, Washington had again begun to act bizarrely; and that, in light of Washington's medical history and bizarre behavior, Silber concluded that Washington's mental condition was deteriorating and he needed to be medicated.

6. Read in isolation, Virginia Code § 53.1–40.1. would be constitutionally defective because it would permit the forcible administration of antipsychotic drugs to an inmate who is simply "incompetent or incapable, either mentally or physically, of giving informed consent" so long as the treatment is in the inmate's best interests. The statute nowhere mentions the other constitutional prerequisite—that the inmate be dangerous to himself or others. For purposes of this case, however, § 53.1–40.1. must be read in

### B.  Procedural Due Process

 The requirements of procedural due process are flexible, calling for such "procedural protections as a particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Those protections, however, should be viewed in terms of their efficacy in reducing "risk of an erroneous deprivation." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The magistrate judge concluded that procedural due process was violated because "Washington received no due process hearing on or about January 10, 1991, when he was actually medicated." The court again disagrees. The court finds that Silber, who, in the exercise of professional judgment, delayed judicially authorized medication to follow a more conservative course, did not violate the flexible requirements of due process.

Read together, Code of Virginia §§ 53.1–40.1. and 53.1–40.2. and related statutes reasonably accommodate liberty interests and medical necessity while protecting against the risk of an erroneous deprivation. Care and treatment orders are for no more than 180 days, and interim periodic reviews are mandated. *See* Va.Code Ann. §§ 53.1–40.6. to –40.7. Under such circumstances and in light of the considerable procedural protections afforded before judicial authorization is given, the likelihood of an erroneous deprivation is minimized. It is neither possible nor helpful to judicially micro-manage an inmate's psychiatric treatment. Psychiatrists must be free to respond to fluctuations or variations in a patient's condition. Accordingly, the court finds no violation of procedural due process.

### III.

Concurring in *Washington v. Harper,* Justice Blackmun stated:

> Much of the difficulty will be lessened if, in any appropriate case, the mentally ill patient is formally committed. This on occasion may seem to be a bother or a nuisance, but it is a move that would be protective for all concerned, the inmate, the institution, its staff, the physician, and the State itself. [citation omitted] It is a step that should not be avoided or neglected when significant indications of incompetency are present.

*Washington v. Harper,* 494 U.S. at 236–37, 110 S.Ct. at 1044–45. Virginia has done precisely what Justice Blackmun suggested. The general district court committed Washington and authorized treatment pursuant to statutes which, when read together, are not only consistent with a prisoner's substantive due process rights, but also afford substantial and meaningful procedures for the protection of those rights.

Judgment will be entered for defendants.

connection with the statute under which Washington was committed, § 53.1–40.2. Because the judge simultaneously considered the petitions to commit and treat Washington, the requisite findings were made and substantive due process met.