993 F.2d 1541
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Lyskoski T. WASHINGTON, Plaintiff-Appellant,
v.
Gershon SILBER, Doctor, Defendant-Appellee,
G. E. Deans, Defendant.
 No. 92-7199.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 2, 1993
Decided: June 2, 1993
 
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Samuel G. Wilson, District Judge. (CA-91-85-R)
 Frederick A. Rowlett, Yeary, Tate, Lowe & Rowlett, P.C., Abingdon, Virginia, for Appellant.
 Frances Marrimon Burwell, Wooten & Hart, P.C., Roanoke, Virginia, for Appellee.
 L. Thompson Hanes, Wooten & Hart, P.C., Roanoke, Virginia, for Appellee.
 W.D.Va.
 AFFIRMED.
 Before HALL and LUTTIG, Circuit Judges, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Lyskoski Washington appeals an order of the district court entering judgment for the defendants in Washington's 42 U.S.C. § 1983 suit challenging, under the Due Process Clause of the Fourteenth Amendment, the involuntary administration of an antipsychotic drug to him at a Virginia correctional mental hospital. We affirm.
 
 I.
 
 2
 Appellant Lyskoski Washington is a Virginia state prisoner. Until November 6, 1990, he had been incarcerated at the Culpeper County Jail and the Brunswick Correctional Center. He was then transferred to the Marion Correctional Treatment Center, a mental health hospital for prisoners, pursuant to an involuntary order of commitment issued by the Brunswick County General District Court under Va. Code § 53.1-40.2. By separate order, the state court authorized involuntary administration of medication under Va. Code § 53.1-40.1. In conformity with those statutes, Washington was represented by counsel at the commitment proceeding. He also had the right to appeal the court's orders, but he did not.
 
 
 3
 The involuntary commitment was based on some bizarre behavior. At the Culpeper County Jail, Washington had been repeatedly observed wrapping his penis in cellophane (to keep it moist, according to Washington), holding a burning match under his scrotum to kill nonexistent crab lice, and talking to imaginary persons. Dr. R. P. Degala examined Washington, and his affidavits were offered in support of the commitment. According to Degala, Washington suffered from "paranoia, delusions, hallucinations, loose associations, bizarre behavior, poor self care, impaired judgment, grandiose [delusions], [and] difficulty concentrating."[1]
 
 
 4
 The state court found that Washington was "so seriously mentally ill as to be substantially unable to care for himself." The court made an equivocal finding-placing a check with a question mark on the form commitment order-about whether Washington was an "imminent danger to himself." The court ordered commitment for 180 days. In its order authorizing administration of medication "as required," the court found that Washington was "incompetent or incapable ... of giving informed consent."
 
 
 5
 At the Marion Center, Washington seemed to get along fairly well for a while. However, in January, 1991, he began to exhibit some of the behavior that led to his commitment, and more-he wrapped his front teeth in tinfoil, tied his scrotum up with a shoestring, and wrapped his penis with plastic wrap. He also went through large amounts of vaseline, which he applied liberally to his lips out of the belief that chapped lips aggravate his penis moisture complaint. One day he put his bed sheets in the toilet. On January 9, his treatment team, headed by defendant Silber, met to discuss his condition. The nursing staff had expressed concern that Washington was going to harm himself by strangling his penis. Silber examined Washington and concluded that his penis was not damaged, but he decided to put Washington on haldol decanoate ("haldol"), an antipsychotic drug. In reaching this decision, Silber was aware that Washington had been successfully treated with haldol some years earlier.
 
 
 6
 On January 10, 1991, and again two weeks later, haldol was administered to Washington over his protests, though he consented to administrations of the drug on subsequent occasions. On January 13, Washington suffered some side effects from the medication (mouth drawn to the side and slurred speech), which were successfully treated with another drug.
 
 
 7
 Washington filed an internal prison grievance concerning the involuntary medication, which was denied. He then filed this § 1983 suit against Dr. Silber and the warden of Marion. Counsel was appointed for Washington, and the case was referred to a magistrate. After a hearing, the magistrate recommended that Washington be awarded $1,000 in damages from Silber, but that the warden be found not liable. Silber filed objections to the magistrate's report. The district court then ruled, contrary to the magistrate, that Washington's rights had not been violated; hence, the court entered judgment for Silber. Washington v. Silber, 805 F. Supp. 379 (W.D. Va. 1992).
 
 
 8
 Washington appeals. He does not challenge the judgment for the warden.
 
 II.
 
 9
 In United States v. Charters, 863 F.2d 302 (4th Cir. 1988) (en banc), cert. denied, 494 U.S. 1016 (1990), this court decided a very similar case. The plaintiff had been arrested for threatening the President, but had been found incompetent to stand trial. He was involuntarily committed to FCI-Butner for evaluation and treatment. In the course of this treatment, he was given antipsychotic drugs, and he sued. Writing for the en banc court, Judge Phillips concluded that (1) every person has a protectible liberty interest in being free from involuntary medication, but, (2) as regards involuntarily committed persons, due process is satisfied if the decision to medicate is based on "professional judgment."
 
 
 10
 A "professional judgment" may be made without an internal adversary hearing. Instead,
 
 
 11
 [t]he decision may be based upon accepted medical practices in diagnosis, treatment and prognosis, with the aid of such technical tools and consultative techniques as are appropriate in the profession. [citation omitted] Without attempting a definitive checklist, it is obvious that a decision of the type here in issue should involve consideration of such factors as the patient's general history and present condition, the specific need for the medication, its possible side-effects, any previous reaction to the same or comparable medication, the prognosis, the duration of any previous medication, etc.
 
 
 12
 863 F.2d at 312. So long as this decision is made by an appropriate medical professional, due process is violated only if the decision is such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 313.
 
 
 13
 Finally, Charters dispels one of Washington's prime arguments here-that, notwithstanding the involuntary commitment, a patient who protests medication is entitled to a new finding of incompetence and dangerousness at the time of the proposed medication. We held that such a requirement would pose an "unavoidable risk" of "flatly inconsistent" competency determinations by different tribunals. Where a "solemn judicial adjudication still stands," the patient's wishes are simply another factor that should be weighed in the medical-not legal-determination to administer a drug.
 
 
 14
 Charters is, we think, completely supportive of Dr. Silber's actions here. The issue then becomes whether Charters is still valid law in the aftermath of Washington v. Harper, 494 U.S. 210 (1990). In its context-formally committed inmates-we believe that it is.[2]
 
 
 15
 In Harper, a prison inmate was involuntarily given antipsychotic drugs, including haldol. The inmate challenged the involuntary treatment under both substantive and procedural due process. The Supreme Court held that substantive due process permits a state "to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227. Procedural due process is satisfied if this decision is made by medical professionals; no judicial preclearance in required. Nonetheless, the substantive findings-dangerousness and the prisoner's medical interest-must be made.
 
 
 16
 In their briefs, the parties spend most of their time struggling over whether the Harper findings were made in this case. The state judge who involuntarily committed Washington found that he was "substantially unable to care for himself." Does that finding make him "dangerous" to himself? We would be inclined to say so,[3] but it is an arguable issue we need not consider today. The state court's order authorizing medication does not address Washington's dangerousness, because the state statute does not require such a finding.
 
 
 17
 The district court made the controlling distinction at the close of its opinion. It quoted Justice Blackmun's concurrence in Harper:
 
 
 18
 Much of the difficulty will be lessened if, in any appropriate case, the mentally ill patient is formally committed. This on occasion may seem to be a bother or a nuisance, but it is a move that would be protective for all concerned, the inmate, the institution, its staff, the physician, and the State itself.
 
 
 19
 805 F. Supp. at 385 (quoting Harper, 494 U.S. at 236-237).
 
 
 20
 The district court noted that the state of Virginia had done just what Justice Blackmun proposed here-it went through a formal judicial process to have Washington committed. The plaintiff in Harper was just an ordinary prisoner; in the eyes of the law he was fully competent. This "competence" is what, in Justice Blackmun's opinion at least, made Harper a troublesome case. That the Court held that even a "competent" inmate may be medicated against his will if certain non-judicial procedural protections are provided ought not bestow additional rights on those who have been afforded a full, formal, adjudicatory process and a solemn, appealable, judicial finding.
 
 
 21
 In conclusion, then, the Charters "professional judgment" standard survives Harper and prescribes the necessary due process minimum where the prisoner has been previously adjudicated incompetent. The record is clear that Dr. Silber exercised professional judgment here. Thus, we affirm.[4]
 
 AFFIRMED
 
 
 [1]
 The doctors at Marion later added a diagnosis of "polysubstance abuse." Washington had begun using drugs (heroin, cocaine, marijuana, and LSD) at age 16; he was 39 at the time of his commitment
 
 
 [2]
 For what it is worth, the Supreme Court denied certiorari in Charters one week after it announced Harper. Thus, the Court allowed our judgment to stand without even a reconsideration in light of Harper
 
 
 [3]
 In O'Connor v. Donaldson, 422 U.S. 563, 574 n.9 (1975), the Supreme Court observed:
 [E]ven if there is no forseeable risk of self-injury or suicide, a person is literally "dangerous to himself" if for physical or other reasons he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends.
 
 
 [4]
 Because we find no constitutional violation, we need not decide whether Silber would nonetheless be protected from a judgment for money damages by the doctrine of qualified immunity-government actors performing discretionary functions are immune from liability unless their actions violate clearly-established rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800 (1982)