Jan JURASEK, Plaintiff,

v.

Mark PAYNE, Craig B. Hummel, M.D., Katherine Greenwood, D.O., Bruce A. Guernsey, D.O., James Hardy, M.D., John Nilsen, D.O., Defendants.

Civ. No. 2:91–C–979G.

United States District Court, D. Utah.

April 10, 1997.

Linda Priebe, Erin Yeh and Karen Owen of the Legal Center for People with Disabilities, for Plaintiff.

Barbara Ochoa and Dan Larsen of the Utah Attorney General's Office, for Defendants.

## MEMORANDUM DECISION AND ORDER

**J. THOMAS GREENE, District Judge.**

Before the court are plaintiff's motion for preliminary injunction and cross motions for summary judgment (plaintiff's motion for partial summary judgment, and defendants' motion for summary judgment). Plaintiff is represented by Linda Priebe, Erin Yeh, and Karen Owen of the Legal Center for People with Disabilities. Defendants are represented by Barbara Ochoa and Dan Larsen of the Utah Attorney General's Office. The motions were fully briefed, and an evidentiary hearing was held on the issue of whether Utah State Hospital (USH) policies and procedures regarding involuntary medication of civilly committed and adjudicated incompetent patients were followed as to plaintiff since his admission to the USH in March 1991. Thereafter, the court heard extensive argument by counsel, and the matter was submitted for decision and taken under advisement. The court now makes and enters its Memorandum Decision and Order.

### Contentions of the Parties

Plaintiff contends that defendants have violated his civil rights under 42 USC § 1983 and the due process clause of the Fourteenth Amendment.[1] In this regard, plaintiff claims that his substantive due process rights have been violated by interference with his liberty interest by forcibly medicating him against his will contrary to his "constitutional right to be free from unwanted, intrusive administration of antipsychotic medication".[2] Plaintiff also asserts that the procedures utilized and/or adopted by the USH for determining to forcibly medicate were inadequate and in violation of his procedural due process rights. Plaintiff further argues that his right to informed consent and substituted judgment on his behalf by his appointed guardian has been denied. Finally, plaintiff maintains that defendants are not entitled to qualified immunity because defendants violated clearly established law at pertinent times. Plaintiff seeks damages and/or injunctive relief, and asserts that injunctive relief should be ordered even if qualified immunity is granted because of the application of state policies and procedures which continue to constitute constitutional violations.

Defendants contend that forcible medication was authorized and necessary because plaintiff was judicially committed to the USH for treatment, after having been found to be mentally ill, dangerous, incompetent, and unable to make medical determinations for himself. In this regard, defendants assert that plaintiff's right to freedom from unwanted administration of antipsychotic medication is outweighed by legitimate and rationally based state interests and that there was no violation of substantive due process rights. Defendants also assert that plaintiff has been afforded adequate procedural due process. Defendants maintain that no constitutional violation occurred concerning lack of in-

---

**1.** Plaintiff also claims that his First Amendment rights to free speech and freedom of thought have been violated because forced medication with antipsychotic drugs has interfered with providing or withholding his informed consent. This court balances both the free speech and due process interests of plaintiff as against competing state interests. *See* Fn. 49, *infra.*

**2.** "Antipsychotic drugs have the capacity to severely and even permanently affect an individual's ability to think and communicate." *Bee v.*

*Greaves,* 744 F.2d 1387, 1394 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). Antipsychotic (or psychotropic) drugs, commonly used to treat mental disorders such as schizophrenia, have the effect of "alter[ing] the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind." *Washington v. Harper,* 494 U.S. 210, 214, 110 S.Ct. 1028, 1032, 108 L.Ed.2d 178 (1990).

formed consent or substituted judgment. They submit that under Utah law and the circumstances of this case, the USH was authorized to provide necessary medical treatment and to override decisions by plaintiff and/or his guardian concerning forcible medication with antipsychotic drugs. Defendants deny that application of existing state policies and procedures in the past or at the present time constitute constitutional violations. Finally, defendants argue that in any event, as applied to the facts of this case at pertinent times, the law was not clearly established and they are entitled to qualified immunity.

## FACTUAL BACKGROUND

*Involuntary Medication Prior to Adoption of the Written USH Policy in December 1991 (From March 1991 to December 1991)*

— *Developmental Stages of 1991 Policy*

At all pertinent times, an applicable Utah statute authorized the Utah State Hospital to provide "treatment of mentally ill persons who have been committed to its custody . . ." Utah Code Ann. 62A–12–207. "Treatment" includes the administration of antipsychotic drugs,[3] but such medication may be prescribed or administered only after determination by a physician that such is required by the patient's "medical needs"[4] in accordance with accepted medical standards.[5] It

was and is the policy and practice of USH that forced medication may be ordered by its physicians only after patients have been afforded a full judicial hearing, determined to be incompetent and civilly committed to the institution pursuant to applicable law. "Medical needs" are determined and evaluated in the exercise of professional medical judgment, and forced medication is administered for compelling reasons, such as exigent circumstances.[6]

In March 1991, Judge Anne Stirba of the Third District Court of the State of Utah, confronted with a pretrial detainee charged with murder,[7] ordered USH to develop policies and procedures for medicating patients involuntarily consistent with due process requirements set forth in *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Shortly thereafter on May 20, 1991, in the case of *Taylor v. Verville,* which involved a patient at USH, Magistrate Judge Ronald Boyce issued a Report and Recommendation to Judge David Winder, D. Utah, which was adopted by the court. No. 90–C–598W (D. Ut. June 5, 1991). It was determined in that case that forced medication may be justified in a hospital setting if the purpose of doing so is "reasonably related" to legitimate state objectives. *Id.* at 7. The court said that the defendants "appear[ed] to have satisfied" the substantive due process requirement of *Washington v.*

---

**3.** By statutory definition, "treatment" includes the "administration of psychotropic medication." Utah Code Ann. 62A–12–202(12).

**4.** Utah Code Ann. 62A–12–244 provides in pertinent part:
In no event shall medication be prescribed for a patient unless it is determined by a physician to be required by the patient's medical needs. Every use of a medication and the reasons therefor shall be made a part of the patient's clinical record.

**5.** Utah Code Ann. 62A–12–243 provides in pertinent part:
Every patient is entitled to humane care and treatment and to medical care and treatment in accordance with the prevailing standards accepted in medical practice, psychiatric nursing practice, social work practice, and the practice of clinical psychology.

**6.** Emergency or "exigent circumstances" was defined in the policy adopted in December 1991 (Def Exh. A) as follows:

A patient may be treated for mental illness under emergency circumstances in which the patient is likely to cause injury to himself or others while residing in the State Hospital if he is not immediately restrained and subjected to treatment. In the circumstance of treatment in exigent circumstances, the treating physician shall certify that he or she is of the opinion that the patient met the foregoing criteria of likelihood of harm. Said certification shall be placed in the patient's file.
In substance this was also the definition and practice in effect at USH prior to adoption of the "12/91" policy.

**7.** Judge Stirba held a series of hearings concerning involuntary medication of Eugene Woodland, a pretrial detainee who had been found incompetent to stand trial for murder due to mental illness. Forced medication was being urged to implement the state's interest in rendering the detainee competent to stand trial.

*Harper,* but held that the state defendants had not shown that the procedural due process requirement had been satisfied. *Id.* at 9.

In June 1991, in particular response to the decision in *Taylor v. Verville,* UHS began to define and formalize policies and procedures with respect to involuntary medication of patients committed to USH. There was uncertainty as to the direct applicability of *Washington v. Harper* to incompetent persons who had been civilly committed to the institution, since *Harper* involved a convicted inmate in the prison setting.[8] In September 1991, a three person USH review committee refused to approve forced medication of a pretrial detainee charged with murder, because the detainee did not pose dangerousness or harm to self or others. Forced medication was then conducted under a USH policy which did not require such dangerousness.[9] Litigation ensued, and after substantial proceedings and hearings the policy absent a requirement of dangerousness was held to be unconstitutional as applied to the pretrial detainee in that case. *Woodland v. Angus,* 820 F.Supp. 1497 (D.Ut.1993). Whether the dangerousness requirement is mandatory as applied to incompetent, civilly committed and institutionalized patients was a matter of uncertainty during the pendency of that litigation, and has remained so even after the court's ruling in March 1993.[10]

"After extensive review and revision," in December 1991, USH adopted finalized policies and procedures concerning "Involuntary Medication of Civilly Committed Patients." [11]

*— Treatment of Plaintiff Prior to December 1991*

Plaintiff suffers from chronic paranoid schizophrenia. From 1980 to 1991 he was committed to the USH on at least six occasions.[12]

On March 28, 1991, Judge Leslie Lewis of the Third District Court, State of Utah, entered an Order for Commitment, finding that plaintiff's "mental condition and immediate danger to self, others or property requires involuntary commitment pending examination and hearing." [13] On that date the court also gave Notice to plaintiff of "Commencement of Proceedings for Involuntary Commitment" [14] and he was admitted to the USH.

---

**8.** *See* Fn. 54, *infra.*

**9.** In September 1991, USH policy permitted medication against the will of a patient if (1) the patient suffered from a mental illness; (2) the patient posed a threat of serious harm to himself, others, or their property; and (3) the treatment was in the patient's medical interest. Under this policy the committee refused forced medication because plaintiff posed no such threat of serious harm. In October 1991, the requirement that the patient be dangerous to himself, others or their property was dropped, and after a new hearing, forced medication was conducted. *See Woodland v. Angus,* 820 F.Supp. at 1500–1501.

**10.** In *Woodland,* Judge Winder of this court ruled that forced medication merely to render a pretrial detainee competent to stand trial did not rise to the level of a compelling state interest. 820 F.Supp. at 1514. The court noted that plaintiff, who had been committed to USH for treatment under a criminal statute after a judicial hearing in which he was determined to be incompetent to stand trial, did not present a danger to himself, others, or property. However, Judge Winder declined to rule on the validity of a Utah statute which did not require a finding of dangerousness because it was enacted after that litigation was commenced and it played no role

in the decision to forcibly medicate. *Woodland* at 1518, n. 28. *See* Fn.26, *infra.*

**11.** Affidavit of Dr. Craig B. Hummel, November 12, 1993, Exhibit A to Defendants' Motion for Summary Judgment.

**12.** Plaintiff Jan Jurasek was involuntarily committed to the USH on seven occasions counting the commitment which commenced in March 1991:
   a. 8/15/80 to 10/27/80
   b. 5/9/86 to 12/12/86
   c. 3/29/88 to 5/4/88
   d. 10/7/88 to 1/12/89
   e. 4/4/89 to 4/24/90
   f. 8/14/90 to 10/10/90
   g. 3/2[8]/91 to the present.
Affidavit of Dr. Craig B. Hummel, *Id.* Fn. 11.

**13.** Def Exh. D.

**14.** The notice was based upon an application alleging that the proposed patient is mentally ill and "has not been taking medications or participating in Mental Health treatment since January 1, 1991. Patient has verbally assaulted others in the trailer court where he lives. In particular Patient tried to force his way into landlords home on 3/22/91. During the incident Jan raised his fist and struck the door." Def Exh. E.

Plaintiff's admitting and treating physicians waited for a formal commitment order[15] from the court before medicating him with antipsychotic drugs. In this regard, Dr. Greenwood recorded on April 10, 1991:

> [Patient] very paranoid and delusional. No cooperation whatsoever. Resists everything. "You're poisoning everyone." Waiting for court commitment so Haldol decanoate can get started.

On April 12, 1991, Judge Scott Daniels of the Utah State Third District Court ordered plaintiff committed to the USH for six months.[16] Immediately after that commitment order, plaintiff was involuntarily medicated with Haldon decanoate. USH records reflect that Mr. Jurasek required restraints because of aggressiveness and that "he threatens to kill staff."

On April 30, 1991, Dr. Greenwood recorded that plaintiff was "quite verbally abusive. Behavior inappropriate ... Will [increase] oral Haldol." On June 4, 1991, Dr. Greenwood wrote that plaintiff was "[n]ot compensating as well as usual. Religious delusions. Will [increase] Haldol," and on June 12, 1991, she recorded that

> [Patient] continues [to be] paranoid and delusional but [he] cooperates. He was seen checking [or hiding] meds and is now being watched carefully. Continue present treatment plan. Discharge to be coordinated through Salt Lake [Mental Health].

On June 25, 1991, Dr. Greenwood met with plaintiff, his patient advocate, and his treatment coordinator. An agreement was reached whereby plaintiff's Haldol level was to be decreased based on his promise to maintain his present level of "Activities of Daily Living" (bathing, hygiene) and to control his temper. By October 2, 1991, however, plaintiff's condition had worsened and Dr. Craig Hummel, the USH Clinical Director, ordered an emergency dosage of Haldol. Dr. Bruce Guernsey, who became plaintiff's treating physician on October 1, 1991, continued medicating plaintiff with Haldol.[17]

---

**15.** At pertinent times, Utah law provided:

> [t]he court shall order commitment ... if ... the court finds by clear and convincing evidence that:
> (a) the proposed patient has a mental illness;
> (b) because of the proposed patient's mental illness he poses an immediate danger of physical injury to others or himself, which may include the inability to provide the basic necessities of life such as food, clothing, and shelter, if allowed to remain at liberty;
> (c) the patient lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment;
> (d) there is no appropriate less-restrictive alternative to a court order of commitment; and
> (e) the local mental health authority can provide the individual with treatment that is adequate and appropriate to his conditions and needs. In the absence of the required findings of the court after the hearing, the court shall forthwith dismiss the proceedings.

UCA 62A–12–234(10).

**16.** In its Findings and Order of Commitment, the court concluded that plaintiff:

  a. has a mental illness; and

  b. because of that illness poses an immediate danger of physical injury to others or self, which may include the inability to provide the basic necessities of life, such as food, clothing, and shelter if allowed to remain at liberty; and

  c. lacks the ability to engage in a rational decision making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment; and

  d. that there is no appropriate, less restrictive alternative to a court order of commitment and that

  e. the division can provide the individual with treatment that is adequate and appropriate for his[ ] conditions and needs ...

Def Exh. G. Plaintiff claims that he was excluded from the hearing before the mental health commissioner which preceded the findings by the court. Plaintiff's Memo in Support of Motion for Partial Summary Judgment (p. 28). However, plaintiff was excluded only after he refused to be quiet, challenged the Commissioner as having only "one more chance," threatened to sue the Commissioner and refused to accept help from his lawyer. Medical testimony was received and the lawyer appointed to represent Mr. Jurasek participated on his behalf Medication to stabilize his condition and make him less dangerous was recommended by Dr. Wender after Dr. Bone testified that his diagnosis was chronic paranoid schizophrenia. *See* Transcript of Hearing dated April 12, 1991, pages 1–5 (Exh. U, attached to Pls. Motion for Partial Summary Judgment.)

**17.** Dr. Guernsey was plaintiff's treating physician until June 1994. Dr. James Hardy became plaintiff's treating physician in August 1994. Dr. John Nilsen became plaintiff's treating physician in March 1996.

On October 9, 1991, Judge Boyd Park of the Fourth District Court reviewed plaintiff's case and continued plaintiff's involuntary commitment for an indeterminate period.[18] Judge Park conducted a full hearing and made findings of mental illness, inability to engage in rational decision-making and other findings similar to those set forth in the prior judicial commitment orders.[19] Subsequent commitment orders and findings by treating physicians have resulted in continual commitment of plaintiff to the USH to this date.[20]

Plaintiff was force medicated at USH during most of 1991 based upon professional medical judgment and determination that such was medically appropriate because of dangerousness, emergency, or other compelling reasons.

*Adoption of the USH Forced Medication Policy; "12/91 Policy" (In Effect from 12/91 until 3/25/93)*

Under the policy adopted in December 1991 ("12/91 Policy"), it was necessary for a duly constituted Committee[21] to find and determine that forced medication was in the patient's "medical best interest" and in accordance with "prevailing standards of accepted medical practice."[22] The policy contained no mandatory requirement that the patient necessarily pose a threat of serious danger to himself or others. That requirement was determined not to be necessary as applied to civilly committed USH patients, apparently because such patients had been judicially determined to pose an immediate danger to self or others in prior commitment and review

---

**18.** This was consistent with findings by Mental Health Commissioner Howard Moetani of the Fourth District Court. Plaintiff's involuntary commitment to the Division of Mental Health was continued for an indeterminate period subject to provisions of Utah law.

**19.** *See* Fns. 13 and 16, *supra*.

**20.** On October 25, 1995, Judge Donald Eyre of the Fourth District Court continued plaintiff's involuntary commitment for an indeterminate period. Since then, plaintiff's treating physicians have certified "that he is in need of inpatient services at the Utah State Hospital."

**21.** The Committee established under the policy was consistent with Utah law then being formulated and which was adopted by the Utah Legislature in early 1992. The law provided in pertinent part:

(1) If, after commitment, a patient elects to refuse treatment with medication, the director of the mental health facility, or his designee, shall submit documentation regarding the patient's proposed treatment to a committee composed of:
(a) a psychiatrist who is not directly involved in the patient's treatment or diagnosis;
(b) a psychologist who is not directly involved in the patient's treatment or diagnosis; and
(c) the clinical director of the mental health facility, or his designee.
(2) Based upon the court's finding, under Subsection 62A–12–234(10), that the patient lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment ... the committee shall authorize involuntary treatment with medication if it determines that:
(a) the proposed treatment is in the medical best interest of the patient, taking into account

the possible side effects as well as the potential benefits of the medication; and
(b) the proposed treatment is in accordance with prevailing standards of accepted medical practice.
Utah Code Ann. 62A–12–234.1 (effective April 27, 1992). This law was repealed in 1994 with this statement:
... the purpose of repealing the procedures dealing with involuntary medication of persons civilly committed and persons committed under criminal states for treatment *is to permit the establishment of procedures by hospital policy, since this area of the law is a rapidly evolving area.* The Legislature, by repealing these statutes, does not intend to state a policy that committed persons should not be subject to involuntary medication when appropriate.
Utah Code Ann. 62A–12–234.1 (Repealed) (emphasis added).

**22.** In pertinent part, the 12/91 Policy states:

"5.9 The Committee shall order involuntary treatment with medication if, upon completion of the hearing and consideration of record, the Committee finds, by majority vote, the following conditions to exist:

5.9.1 *The proposed medication treatment is in the medical best interest of the patient,* taking into account the possible side effects of the treatment as well as the potential benefits of the treatment, and

5.9.2 *The proposed medication treatment is in accordance with prevailing standards of accepted medical practice."*
Def. Exh. A (Emphasis added). Utah law at pertinent times also required determination by a physician of the patient's "medical needs" as a condition of prescribing or administering medications. Utah Code Ann. 62A–12–244. *Cf.* Fns. 4 and 5, *supra*.

orders [23] in accordance with Utah law.[24] The policy was applicable to all civilly committed patients, without guardian, residing at the State Hospital. The same policy was applied to Mr. Jurasek, however, even though he had an appointed guardian. Procedures were set forth in the event that a patient refused a proposed course of medication treatment, including: (1) a hearing before a duly constituted committee; (2) 24 hours' notice of the hearing, including the basis for the diagnosis and reasons the treating physician believed medication was necessary; (3) entitlement of the patient to attend the hearing, present evidence, and examine witnesses (in this regard, the patient was allowed to be represented by a lay advisor, but not an attorney); and (4) right to appeal the committee's decision to the USH Clinical Director.[25] Force medication of plaintiff was administered pursuant to this policy from December 1991 until the "3/93 Policy" was adopted.

*Revision of the USH Forced Medication Policy" "3/93 Policy"* (In Effect from 3/93 until 2/94)

In response to the decision and order of the United States District Court for Utah in *Woodland v. Angus,* 820 F.Supp. 1497 (D.Utah 1993),[26] USH revised its policy regarding forced medication of civilly committed patients, effective March 25, 1993.[27] The new policy added the requirement that the patient be "gravely disabled" [28] *or* pose a "likelihood of harm to self and/or others," and contained the same procedural requirements as the "12/91 Policy".

Defendants force medicated plaintiff under the "3/93 Policy" starting March 30, 1993. On January 27, 1994, however, plaintiff's court appointed guardian, Ms. Lord, for the

---

**23.** See Fns. 13, 16 and 18, *supra.*

**24.** See Fn. 15, *supra.*

**25.** At all pertinent times the Clinical Director at USH was Dr. Craig B. Hummel who was appointed pursuant to Utah Code Ann. 62A–12–212 which provides:

Whenever the superintendent is not qualified to be the clinical director of the state hospital under this section, he shall, with the approval of the director of the division, appoint a clinical director who is licensed to practice medicine and surgery in this state, and who has had at least three years' training in a psychiatric residency program approved by the American Board of Psychiatry and Neurology, Inc., and who is eligible for certification by that board.

**26.** Judge Winder ruled that the USH's policy on forcible administration of antipsychotic drugs violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution as applied to a pretrial detainee charged with murder who had been judicially determined to be incompetent to stand trial and had been committed to USH for treatment. The policy was struck down because

First ... it does not require a finding that plaintiff is dangerous to himself, other[s] or property, in which case *Harper* would allow such a procedure. Second, there is no compelling interest supporting the State's attempt to forcibly medicate plaintiff pursuant to this section to render plaintiff competent to stand trial. Third, it would be inconsistent with the Due Process Clause to medicate plaintiff pursuant to Revised Section 11 in furtherance of the State's *parens patriae* interest; rather, the State must follow its own laws regarding the

exercise of substituted judgment for incompetent individuals.

*Woodland* at 1518–19. See Fn. 10, *supra.*

**27.** In pertinent part, the 3/93 Policy states:

"5.9 The committee shall order involuntary treatment with medication if, upon completion of the hearing and consideration of record, the committee finds, by majority vote, the following conditions to exist:

5.9.1 the patient suffers from a *mental illness;*

5.9.2 the patient is *gravely disabled or poses a likelihood of harm to self and/or others;*

5.9.3 the patient *lacks the ability to engage in a rational decision-making process* regarding the acceptance of mental treatment, as demonstrated by evidence of inability to weigh the possible costs and benefits of the treatment;

5.9.4 the proposed treatment is in the *medical best interest* of the patient, taking into account the possible side effects of the treatment as well as the potential benefits of the treatment; *and*

5.9.5 the proposed treatment is *in accordance with prevailing standards of accepted medical practice"*
Def Exh B (emphasis added).

**28.** *Gravely Disabled:* means a condition in which a person, as a result of a mental disorder, (1) is in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety or (2) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety. Def Exh. B.

first time purported to exercise substituted judgment on behalf of plaintiff and demanded that the USH take plaintiff off *all* medications. Dr. Guernsey honored her request and took plaintiff off Haldol that day, but only after strongly advising her against such a course of action.[29] Since Haldol's half-life is approximately 4 weeks, even though Dr. Guernsey "took him off" the medication, plaintiff was essentially still medicated for a period of time. This incident was the first time USH had experienced a guardian's request to stop medications. Within three weeks after this incident Ms. Lord sent a letter of resignation to the state court to terminate the guardianship,[30] and in July 1994 she was formally terminated. According to the record before this court, no other guardian has since been appointed for plaintiff.

*Further Revision of the USH Forced Medication Policy: "2/94 Policy" (In Effect From 2/94 Until the Present)*

Because of plaintiff's deteriorating condition as a result of withdrawal from medication, an involuntary medication hearing was scheduled for February 24, 1994. Plaintiff's court-appointed guardian received 24 hours' notice of the hearing but did not attend. Ms. Lord did not ask for an extension of time or otherwise respond to the notice.

Adoption of a proposed revised forced medication policy was also scheduled for February 24, 1994. That policy ("2/94 Policy") was adopted by Mark Payne and two other board members, acting on behalf of the USH governing board. This was authorized procedure since the entire governing board met only twice a year. The patient's medical interests and needs as well as medical appropriateness as determined by a physician were required under the policy,[31] and conditions required to exist to justify involuntary treatment were set out.[32]

The revised USH policy was made applicable to "all civilly committed patients residing at the State Hospital," dropping the language in the prior policy which in form applied only to patients "without legal guardian." Under the policy, an involuntary medication hearing must be held prior to administration of forced medication whether or not the patient has an appointed legal guardian.

---

**29.** Ms. Lord claims that on January 27, 1994 Dr. Guernsey told her that if litigation were to result from damages caused by plaintiff, he would have to testify against her and say that she is responsible for plaintiff's actions because she had stopped his Haldol medications. Dr. Guernsey disputes having said this, but agrees that he ordered the force medication of plaintiff to stop because of the intervention of Ms. Lord and that he told Ms. Lord that such was against his advice.

**30.** Letter dated February 15, 1994. Def Exh. J. *See* Fn. 38, *infra,* and accompanying text.

**31.** In making the decision to administer medication, the physician considers the patient's medical interests and needs and the purpose for which the patient is being treated. In determining the medical appropriateness of the course of treatment which the physician selects, the physician considers whether the purpose of the treatment can be achieved by using less intrusive means. Def Exh. C.

**32.** In pertinent part, the 2/94 Policy provides: "6.9 The Committee orders involuntary treatment with medication if, upon completion of the hearing and consideration of record, the Committee finds, by majority vote (one of which must be the psychiatrist), the following conditions to exist:

6.9.1 the patient is, or will be, *gravely disabled and in need of medication treatment or continuing medication treatment,* for the reason that he or she suffers from a mental disorder such that he or she (a) is in *danger of serious physical harm* resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests, or will manifest, *severe deterioration* in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety; *or*

6.9.2 without the medication treatment or continuing medication treatment, he or she *poses, or will pose, a likelihood of serious harm to himself/herself. others, or their property.* "Likelihood of serious harm" means either (a) substantial risk that physical harm will be inflicted by an individual upon his/her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear for sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others."
Def Exh. C. (Emphasis added.)

After adoption of the "2/94 policy," the Committee recommended that plaintiff be medicated with Prolixin. This overrode Ms. Lord's request that plaintiff not be medicated at all. Plaintiff appealed, and that same day Dr. Hummel, Clinical Director, upheld the Committee's decision. On February 25, 1994 Dr. Guernsey as treating physician[33] medicated plaintiff with Prolixin. The "2/94" Policy has been in force and effect since that date, and plaintiff continues to be force medicated when necessary under the terms and procedures set out in that policy.

*Limited Role of Plaintiff's "Guardian" Concerning Medical Decisions:*

Some years ago, Eugene Thorne, an attorney and long-time friend of plaintiff, sought out another friend of plaintiff, Ms. Judy Lord, to act on his behalf as a "go-between" with the hospital. Mr. Thorne had represented plaintiff in the past and wanted Ms. Lord to facilitate and "smooth over" relations with the USH. Ms. Lord agreed to such an arrangement and nothing more, and without studying the documentation thought that was all that was intended in August 1988 when she became a court-appointed guardian for plaintiff. Ms. Lord testified at the August 1996 hearing before this court that prior to January 1994, she did not understand her possible role at involuntary medication hearings, i.e., making objections to plaintiff's medications and asserting substituted judgment as to medications on behalf of plaintiff at such hearings. Ms. Lord did attend at least one such involuntary medication hearing, but thought that it was a further commitment hearing. The USH apparently did not notify her of many of plaintiff's involuntary medication hearings. The USH staff as well as Ms. Lord viewed her "guardian" role as very limited, i.e., acting as a friend and adviser, not as one purporting to exercise substituted judgment concerning medical decisions.[34]

Prior to January 1994, Ms. Lord had never objected to specific medications, but in mid-1993 she expressed concern as to the effectiveness of the medications.[35]

On January 17, 1994, Dr. Hummel and Dr. Guernsey discussed the status of Ms. Lord as plaintiff's guardian and her expressed concerns about plaintiff's medication. The doctors acknowledged that Ms. Lord technically did have authority under the existing USH policy to make medication decisions on plaintiff's behalf.[36] On January 27, 1994, Dr. Guernsey discussed with Ms. Lord her authority to make such medication decisions, whereupon she directed that plaintiff be taken off all medications. Dr. Guernsey agreed to do so but strongly advised against it.

After conversations between Ms. Lord and Dr. Guernsey on January 27, 1994,[37] it became apparent that Ms. Lord was unwilling to take on the "new" and added responsibility

**33.** *See* Fn. 17, *supra.*

**34.** Ms. Lord believed that her role did not extend to decisions regarding plaintiff's medications. She testified that in becoming plaintiff's guardian she was able to have more access to him and was able to assist him more in the hospital setting. In a letter to the state court, she described her role as "the position a family member might take as a spokesperson for Jan, a liaison between Jan and his medical care givers." Letter dated February 15, 1994. Def Exh. J.

**35.** In mid–1993, Ms. Lord expressed concern to Dr. Hummel that Haldol did not seem effective, whereupon Dr. Hummel suggested Clozaril, an antipsychotic medication, as an alternative and encouraged Ms. Lord to persuade plaintiff to take it. Clozaril would have required plaintiff's cooperation in a weekly drawing of blood to check levels of white blood cells. Apparently Mr. Jurasek did not want to try Clozaril, and on January 3, 1994, Ms. Lord again expressed concern to Dr. Hummel that Haldol was not effective. As a result, Dr. Hummel suggested to Dr. Guernsey

that plaintiff's medication be changed to Prolixin, another alternative antipsychotic medication.

**36.** Utah law provides that the guardian of an incapacitated person has the authority to "give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care, counsel, treatment or service." Utah Code Ann. § 75–5–312(2)(c) (1995). In May 1993, USH adopted a statement of Patients Rights which provided that "[t]o the extent permitted by law, a patient's legal guardian may exercise the rights delineated on behalf of a patient if the patient has been adjudicated incompetent or is a minor."

**37.** By mid-January, Dr. Guernsey recommended to Ms. Lord that plaintiff switch from Haldol to Prolixin. Ms. Lord consented. But after considering the matter further, Ms. Lord thought she could remember a time when plaintiff had been on Prolixin and that it had not been effective so she called Dr. Guernsey to object to the proposed medication. In a January 20, 1994 conversation with USH psychologist Dr. Ronald France, Ms. Lord expressed hesitation about plaintiff being on *any* kind of psychotropic medication.

of exercising judgment as to medical decisions. On February 15, 1994 Ms. Lord sent a letter of resignation to the state court, stating that her understanding of her "limited" role had suddenly changed and that she wanted to be relieved of any responsibilities concerning medical decisions. She wrote:

> Then, on January 27th, 1994, Dr. Guernsey of the Utah State Hospital told me that, as Jan's guardian for mental health treatment, I am solely responsible for decisions about Jan's treatment and the results thereof. That is the other extreme, still not the position I agreed to take. Jan needs a friend as much as a guardian, and I do not believe I can be both. I can help best by being his friend. I also worry that I would be putting my and, more importantly, my retired husband's, financial future in jeopardy by continuing this guardianship.
>
> Therefore, I am requesting that I be released from this appointment.[38]

*Application of USH Forced Medication Policies to Patients With Guardians*

Dr. Hummel testified in substance at the evidentiary hearing in August 1996, that his conception of the status of patients who had been judicially committed and institutionalized at the USH was that they had been adjudicated as incompetent because they could not make medical decisions for themselves, and that the State Hospital was empowered by Utah law to make mental care decisions and to provide necessary treatment whether or not a guardian was appointed. He said that he did not believe plaintiff needed a guardian to make medication decisions because those determinations had been delegated to the mental health authorities by law and the civil commitment order. He believed that plaintiff's medical best interest was being advocated by the USH staff. In a letter in support of Ms. Lord's resignation as guardian, he wrote:

In my opinion, Mr. Jurasek does not need a guardian for his mental health matters. This is because a person is deemed incompetent for his mental health issues when they are committed. Also our forced medication policies ensure that the person receives due process in the form of an administrative hearing with a psychiatrist, psychologist and hospital administrator, as per *Washington vs. Harper*.

I do not know if Mr. Jurasek is in need of a guardian for other purposes, such as money matters or other personal finance, but most of his problems are centered around his mental illness.

In summary, Mr. Jurasek has had ample due process and is incompetent by Utah statute to make decisions concerning his mental health care. Decisions as per his care are awarded to the local mental health center, who has delegated that responsibility to the Utah State Hospital. I do not see that he is in need of a guardian for these matters at this time.[39]

Although the policies and procedures in effect until February 1994 in form were not made applicable to patients with guardians, such were applied to Mr. Jurasek in the same way as they were applied to patients who did not have legal guardians. The court finds that even if defendants at all pertinent times had given notice and attempted to obtain substituted judgment from the guardian appointed for Mr. Jurasek, the result would have been the same because the guardian did not and would not exercise substituted judgment as to medical decisions at any time prior to termination of the guardianship in July 1994, except for the above described occasion on January 27, 1994. Additionally, defendants reasonably believed that the exercise of decisions concerning mental treatment and medications had been delegated by law to the USH as to civilly committed incompetent patients.[40]

38. Defs. Exh. J.

39. Pls. Exh 1.

40. The USH defendants relied upon the authorization in Utah law and judicial orders of commitment in furtherance thereof *See* Fn. 15, 16 and 18 *supra*. Judge Winder had ruled in March 1993 that "... the State must proceed according

to its own laws for the appointment of a guardian for incompetent persons." *Woodland v. Angus*, 820 F.Supp. 1497, 1517. Defendants reasonably believed that the statement concerning guardian appointment for a pretrial detainee who had been committed for treatment to USH was not applicable to persons determined to be incompetent and committed to USH under civil commitment orders. *Woodland* involved a pre-

*Involuntary Medication Hearings*

From 1991 to 1996 the USH held numerous involuntary medication hearings concerning plaintiff. At the evidentiary hearing before this court on August 20–21, 1996, plaintiff denied that he absolutely refused forced medication with Haldol at any of the hearings or on any occasion, and testified that he made "no objections, just requests" that the amount of Haldol be reduced. Plaintiff also testified that he told his doctors that he wanted to go off Haldol in a "medium turkey" fashion as opposed to "cold turkey."

Involuntary medication hearings were held for plaintiff pursuant to the "12/91 Policy" on January 16, 1992; January 30, 1992; April 23, 1992; October 8, 1992; and January 7, 1993. On April 23, 1992 the committee's decision to forcibly medicate was upheld on appeal by the USH Clinical Director. Mr. Jurasek also appealed the medication decision by the committee rendered on October 8, 1992. The USH Clinical Director upheld the committee's decision that Mr. Jurasek required medication. Dr. Craig Hummel was the Clinical Director in both instances. At one time prior to both dates he had treated the plaintiff, but at the time of decision he was not the attending physician of plaintiff.[41] The decisions made by Dr. Hummel in both instances were made on the basis of exigent circumstances and not as a treating physician.

Involuntary medication hearings pursuant to the "3/93 Policy" were held for the plaintiff on March 30, 1993, July 6, 1993, and October 14, 1993.

On February 24, 1994, the first involuntary medication hearing was held pursuant to the "2/94 Policy." The USH Clinical Director upheld on appeal the committee's decision to involuntarily medicate on the same basis as he had done so on the prior two occasions. During the period February 1994 to present, additional involuntary medication hearings relating to Mr. Jurasek have been held pursuant to that policy, in accordance with procedures which were adopted and in force.

*USH Followed and Applied Utah Law and Its Own Policies at All Pertinent Times*

■ The court rejects plaintiff's claims that in force medicating him with antipsychotic drugs defendants violated their own USH policies and state law. In this regard, plaintiff claims that he was prohibited from bringing his own lawyer to forced medication hearings,[42] he was expelled from such hearings and therefore lost the opportunity to cross examine witnesses and present evidence,[43] and on appeal he was denied an independent decision maker.[44] (Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, p. 22–23.) In addition, plaintiff claims that defendants failed to follow their own Statement of Patients Rights adopted in May 1993 (Pl.Exh. F) by not obtaining a written consent document from plaintiff or his guardian concerning forced medication,[45] by failing to obtain sub-

---

trial detainee whom the state sought to forcibly medicate in order to render him competent to stand trial for murder. He had been committed for treatment under authority of a criminal statute, but he had not been civilly committed to the institution with all of the findings required by law as was the case with Jurasek. *See* Fns. 10 and 26, *supra.*

**41.** The 1991 policy, as with subsequent policies, contained a provision which precluded the Clinical Director or other personnel from acting on appeal if that person was also the attending physician of a patient. The policy provided:

    4.2 The committee members shall not be, at the time of the hearing, involved in the patient's treatment or diagnosis. However, members are not disqualified from sitting on the committee if they have treated or diagnosed the patient in the past.

Def Exh. A.

**42.** *See* Fn. 64 *infra* and accompanying text.

**43.** Plaintiff cites only to Response to Request for Admission No. 107 in which defendants admit that plaintiff was expelled from an Involuntary Medication Review Hearing "on at least one occasion for disruptive behavior." This was in accordance with a written policy in force and effect at all pertinent times which this court considers to be an appropriate and reasonable policy. *See* Fn. 65, *infra.*

**44.** *See* Fn. 41, *supra* and accompanying text.

**45.** The Statement of Patients Rights provides that

    [a] written, dated, and signed consent form is obtained from the patient or the patients' legal guardian ... for use or performance of ... other procedures where consent is *required by law.* (Emphasis added.)

USH Statement of Patient Rights at para. 17, p. 3, Ex. F, Pls. Motion for Partial Summary Judgment. Defendants reasonably believed in the circumstances of this case that since consent had

stituted consent from plaintiff's guardian[46] and by failing to permit plaintiff to have a lawyer of his choice at hearings.[47] (Plaintiff's Memorandum at p. 14). As noted in the cited footnote references and accompanying text, USH policies in force at all applicable times were not violated under the circumstances presented in this case.

This court finds that at all times after plaintiff's admission to the USH in March 1991, on the occasions in which defendants administered antipsychotic drugs and/or medications involuntarily to plaintiff, such was done in accordance with the policy or practice which was in force at USH at the time of medication. In all instances, forced medication was administered only upon determination of medical need by doctors and only after a judicial commitment to the institution and a judicial determination of incompetence had been rendered by clear and convincing evidence pursuant to a Utah statute which requires that a finding be made that "[t]he patient lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment."[48]

This court also finds that at all pertinent times since March 1991, USH adhered to and followed the statutes adopted by the Utah State Legislature in all particulars concerning persons who were civilly committed and adjudicated incompetent.

*Policies Reasonably Related to State Interests*

■ At all pertinent times since March 1991, the court finds that the policies and procedures of the USH concerning the forcible administration of antipsychotic drugs were reasonably related to the accomplishment of one or more of the following state objectives and interests: (1) to provide a judicially committed and incompetent patient with necessary and adequate medical care; (2) to provide a safe and orderly environment for the judicially committed and incompetent patient and others, including to prevent the likelihood of serious harm to self or other patients and persons; (3) to provide medication treatment for gravely disabled patients; and (4) to enable the judicially committed patient to return to a state of medical health and be discharged from the USH.

## ANALYSIS

### I. CONSTITUTIONAL RIGHT TO BE FREE FROM UNWANTED ANTIPSYCHOTIC MEDICATION

■ The existence of a constitutional right to refuse involuntarily administered psychotropic drugs grounded upon a liberty interest under the due process clause of the Fourteenth Amendment is undisputed. It is also agreed that the constitutional right is not absolute and must be balanced against competing and relevant state interests.[49]

In *Washington v. Harper*, 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990), the Supreme Court recognized the existence of a "significant liberty interest in

---

been refused they were authorized to provide necessary treatment (including forced medication) after complying with applicable policies and procedures, and that the patient's or guardian's consent was not "required by law." *See* Fns. 15, 16, 18 and 40, *supra*.

**46.** *See* prior discussion in re Limited Role of Plaintiff's "Guardian" Concerning Medical Decisions and Application of USH Forced Medication Policies to Patients with Guardians.

**47.** *See* Fn. 64 *infra* and accompanying text.

**48.** Utah Code Ann. 62A–12–234(10)(c).

**49.** In this case plaintiff argues that his First Amendment rights also have been violated be-

cause of the impact upon his thought processes and speech caused by forced medication without his informed consent. The same balancing test and considerations are presented as under the Fourteenth Amendment, however. In *Bee v. Greaves*, 744 F.2d 1387, 1394 (10th Cir.1984), the Tenth Circuit regarded a plaintiff's rights under the First Amendment as well as plaintiff's liberty interest in avoiding unwanted medication as not absolute, i.e., the interest "must be balanced against competing state interests to determine whether [the protected interest] is outweighed by 'the demands of an organized society.'" (Quoting *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982) and *Poe v. Ullman*, 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961).)

avoiding the unwanted administration of antipsychotic drugs," and analyzed forced medication in terms of substantive and procedural requirements under the due process clause of the Fourteenth Amendment. The court stated:

"[T]he substantive issue involves a definition of the protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills v. Rogers*, 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982) (citations omitted).[50]

494 U.S. at 220, 110 S.Ct. at 1036.

In this case, the court is called upon to examine substantive due process standards, the standard of review applicable thereto, and procedural due process requirements in the context of forced medication of plaintiff, a person involuntarily committed to the Utah State Hospital after having been judicially determined to be incompetent and incapable of providing informed consent. Further, the court is called upon to determine whether the doctrine of qualified immunity applies to defendants in this context.

## A. STANDARD OF REVIEW

In *Youngberg v. Romeo*, the Supreme Court rejected compelling or substantial necessity tests concerning validity of state regulations concerning an involuntarily committed (and severely mentally retarded) patient, stating "we think this requirement would place an undue burden on the administra-

tions of institutions … and would restrict unnecessarily the exercise of professional judgment as to the needs of the residents." 457 U.S. 307, 322, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28, 41 (1982).

The Supreme Court in *Harper* adopted the "reasonably related" test in the prison environment setting. 494 U.S. at 223, 110 S.Ct. at 1038.[51] In mid 1991, in the case of *Taylor v. Verville*, a judge of this court determined that the "reasonably related" standard applies also to confinees of the Utah State Hospital:

[W]here a state prison or hospital regulation impinges on a confinee's constitutional right, but its purpose is *reasonably related to a legitimate state objective*, then the regulation is permissible. Thus, a state's interest, whether in a prison or a state hospital are identical.[52] (Emphasis added.)

■ This court adopts the "reasonably related" test, rather than the "compelling necessity" or "strict scrutiny" tests urged by plaintiff, as the proper standard of review applicable to the policies and regulations of USH concerning involuntary medication of patients who have been adjudicated incompetent and civilly committed to the Utah State Hospital.

## B. SUBSTANTIVE DUE PROCESS
### 1. *Context of Confinement*

The balance of interests between the state and the person in question varies markedly depending on the context in which the rights are asserted. In this regard, in *Youngberg v. Romeo*, a case involving conditions of confinement in an institutional setting,[53] the Supreme Court stated:

**50.** In the prison context presented in *Harper*, the court said

Restated in terms of this case, the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient. 494 U.S. at 220, 110 S.Ct. at 1036.

**51.** The court said:
… the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests." *Tur-*

*ner, supra,* 442 [482] U.S. at 89, 107 S.Ct. at 2261. This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review. (Citations omitted.)
*Washington v. Harper*, 494 U.S. at 223, 110 S.Ct. at 1037.

**52.** Case No. 90–C–598W, Magistrate Judge's Report and Recommendation at 6 (D.Ut. May 20, 1991), approved and adopted June 5, 1991.

**53.** *Youngberg* involved a mentally retarded patient who challenged his conditions of confinement and restraint at a state hospital. The pa-

The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint ... is such as to violate due process. In determining whether a substantial right protected by the Due Process Clause has been violated, it is necessary to balance "the liberty of the individual" and the "demands of an organized society." *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). In seeking this balance in other cases, the Court has weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty.

457 U.S. at 320, 102 S.Ct. at 2460. In *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), the Supreme Court was confronted with a case similar to the case at bar involving forced medication of a person civilly committed to an institution. Because of an opinion issued by the Massachusetts high court after Certiorari was granted, the Court remanded the issue and did not decide the merits of the case, although the court assumed that "involuntarily committed mental patients do retain liberty interests protected directly by the Constitution, cf. *O'Connor v. Donaldson* [422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)] (citation omitted), and that these interests are implicated by the involuntary administration of antipsychotic drugs." *Id.* at 299, n. 16, 102 S.Ct. at 2448, n. 16.

In *Washington v. Harper,* the Supreme Court analyzed substantive standards required to justify forced medication in the context of the prison environment. The court held that a mentally ill inmate may be treated involuntarily with antipsychotic drugs where "the inmate is dangerous to himself or others *and* the treatment is in the inmate's medical interest." 494 U.S. at 227, 110 S.Ct. at 1040 (emphasis added).[54] The Supreme Court thus established standards for forced medication of an inmate in a prison setting which required findings that (1) the patient suffers from a mental illness; (2) the patient poses a threat of serious harm to herself, others, or their property; and (3) the treatment is in the patient's medical interest.[55] In 1992, the Supreme Court apparently modified the absolute requirement of dangerousness as a necessary element in forcible medication policies adopted by states, in the case of *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).[56] The court stressed the necessity to demonstrate that treatment with antipsychotic medication was medically appropriate, taking into consideration less intrusive alternatives, and stated that the state district court's order allowing administration of Mellaril to continue was deficient because it did not

---

tient's mother brought suit on his behalf against institution officials claiming that his constitutional rights to safe conditions of confinement, freedom from bodily restraint, and training or rehabilitation had been violated.

**54.** *Harper* involved the forcible medication of a prison inmate described by the court as a *"competent,"* nonconsenting inmate." 494 U.S. at 218, 110 S.Ct. at 1035 (emphasis added). Mr. Harper was sentenced to prison in 1976 but was paroled in 1980 on condition that he participate in psychiatric treatment. He was later sent to a hospital pursuant to a civil commitment order. His parole was revoked after he assaulted two nurses; he was returned to prison in late 1981. At the prison he objected to antipsychotic drugs. The Court addressed the question of whether a judicial hearing is required before the State may treat a mentally ill prisoner with antipsychotic drugs. It held that neither substantive nor procedural due process were violated under the policy which required no judicial hearing because the prisoner was found to be dangerous, treatment was in his best medical interest, and an

administrative panel of medical professionals "adequately protected, and perhaps better served" the inmate's interests than would a judge. 494 U.S. at 224–227 and 231, 110 S.Ct. at 1038–1039 and 1042.

**55.** 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

**56.** *Riggins* involved a defendant charged with murder and robbery who had been found competent to stand trial after a psychiatrist prescribed the antipsychotic drug Mellaril. During trial, Riggins moved to suspend the administration of Mellaril, arguing that its use violated his constitutional rights, including the right to show jurors his true mental state when he presented an insanity defense. The court held that forced administration of antipsychotic medication during the trial violated his constitutional rights because the Nevada courts failed to make findings sufficient to "support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy ..." 504 U.S. at 138, 112 S.Ct. at 1817.

indicate a finding that safety considerations or *other compelling concerns* outweighed Riggins' interest in freedom from unwanted antipsychotic drugs. 504 U.S. at 136, 112 S.Ct. at 1816 (emphasis added).

In *Bee v. Greaves,* 744 F.2d 1387 (10th Cir.1984) *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985), the Tenth Circuit was confronted with a First and Fourteenth Amendment challenge against forced medication of a pretrial detainee. The court concluded that "a pretrial detainee retains a liberty interest derived from the Constitution in avoiding unwanted medication with [antipsychotic] drugs," but that "the protected interest is not absolute. It must be balanced against competing state interests to determine whether it is outweighed by 'the demands of an organized society.' " *Id.* at 1394 (quoting *Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982)). The court stressed the necessity to comply with state law in conducting a judicial commitment hearing at which findings concerning mental illness and the lack of ability to make decisions would be required before forced medication could be administered. The court said:

> Utah has recognized the right of a mentally ill person not to be subjected to involuntary mental treatment *absent a hearing at which the court finds inter alia that "[t]he patient lacks the ability to engage in a rational decision-making process* regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment." Utah Code Ann. § 64–7–36(10)(c) (Supp.1983).

*Id.* at 1395 (emphasis added). After remand of the case, the Tenth Circuit on the second appeal again stressed that reliance on one Utah law which authorized such treatment was misplaced because the defendant psychiatrist knew that forced medication would be in violation of another Utah law which required a *judicial involuntary commitment proceeding* before a mentally ill person could be subjected to involuntary treatment. *Bee v. Greaves,* 910 F.2d 686, 688 (10th Cir.1990).

In *Washington v. Silber,* 805 F.Supp. 379 (W.D.Va.1992), *aff'd,* 993 F.2d 1541 (4th Cir. 1993)the court was confronted in a civil rights action with administration of antipsychotic drugs against the will of a prison inmate after a finding of incompetence and judicial commitment for treatment. The court found no violation of substantive or procedural due process, ruling that although the inmate does not threaten actual violence to himself, such a person may be properly committable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable. The court ruled that the inmate's medical interest had been taken into account pursuant to a Virginia law which required such. The court said:

> Pursuant to that authorization, Silber injected Washington with Haldol to prevent Washington's condition from deteriorating further. Substantive due process requires no more.

805 F.Supp. at 384.[57]

### 2. *Application to Policies and Regulations of USH*

■ The USH policies and practices which plaintiff claims do not pass substantive due process constitutional muster essentially are that (1) involuntary medication was administered under a policy which only required professional medical judgment in accordance with prevailing standards of accepted medical practice, with no requirement of a finding of dangerousness or a formal hearing other than the judicial commitment hearings required by Utah law, from March 1991 to January 1992; (2) forced medication was administered under a policy which did not require a finding of dangerousness from January 1992 to March 1993; (3) forced medication was and is administered under a policy which permits treatment for "grave

---

**57.** *See* discussion of this case in the context of the impact of a judicial commitment order upon substantive due process, Fn. 73, *infra,* and accompanying and preceding text.

disability," from March 1993 to. present; and (4) forced medication was and is administered under a policy which denies patients with guardians the right to refuse antipsychotic drugs through the substituted judgment of a guardian, from February 1994 to date. Under the circumstances of this case, this court rejects each of the substantive due process challenges.

This court makes the following findings and conclusions as to substantive due process as applied in this case.

\* During the period March 1991 to December 1991, plaintiff was civilly committed to USH after full hearings in March and April. That commitment was reviewed and continued in effect at a further judicial proceeding in October. Forced medication was administered in furtherance of judicial findings, including incompetence and dangerousness, by separate judges in those proceedings. In each instance.of involuntary medication, USH physicians found such to be in the medical best interest of plaintiff, after exercise of medical judgment that plaintiff's condition and compelling reasons required such treatment. There was substantial uncertainty and the law was not clearly established as to the substantive and procedural standards applicable to institutionalized incompetents who were judicially committed for treatment at USH.

\* Under the "12/91" policy, in effect from December 1991 to March 1993, in each instance wherein plaintiff was forced medicated, such was done for some compelling reason such as medical deterioration or exigent circumstances based upon the exercise of professional medical judgment and a finding of medical necessity. There was substantial uncertainty and the law was not clearly established as to substantive standards applicable to institutionalized incompetents who had been judicially committed for treatment at USH. Defendants reasonably concluded that involuntary medication could be administered for compelling reasons as determined in the exercise of professional medical judgment.

\* Under the "3/93" policy, in effect from March 25, 1993 to February 24, 1994, plaintiff was force medicated after determination of medical necessity and appropriateness in

situations where dangerousness was determined to exist or where USH doctors determined that plaintiff's condition was such that he was "gravely disabled." Where dangerousness was found to exist, doctors applied medication pursuant to established procedures because of exigent circumstances. Medication was also applied when doctors found grave disability to exist. In that regard, Dr. Hummel testified that without medication, plaintiff was gravely disabled and would become a very quick danger to others, based upon notations in plaintiff's hospital chart and by his long history of threatening people and assaulting people. Exhibit K, Defs' Motion for Summary Judgment; Hummel Dep. at 175:3–12 and 179:10–13. Dr. Bruce Guernsey testified that when plaintiff was on medication he was a totally different person than when he was off medication, in which case "He was easily agitated, to the point where he would become potentially violent, threatening others, threatening me, to the point of actual physical harm to others at times, off of the medication."

\* Plaintiff claims that there were situations during this period of time and at other times in which he was force medicated on the basis of dangerousness when in fact there was no danger. Plaintiff also claims that the administration of drugs was not in his medical interest because none of the drugs "have been effective in treating Mr. Jurasek's mental illness and have caused him to suffer adverse effects." [58] The court finds, however, that in each such case the physician in question had determined as a matter of medical judgment that there was danger to the patient or others and that forced medication was in plaintiff's medical interest. In instances where medication was administered involuntarily for "grave disability," medical judgment had been exercised and it was determined that such constituted a compelling and necessary reason to medicate even though no finding of the threat of harm or damage to self or others was found to exist at the time of medication.

\* Substantial uncertainty continued to exist during this period, as well as beyond that period and to date, as to whether a finding of

---

**58.** Pls Motion for Partial Summary Judgment at

3. *See* Fn. 37, *supra.*

dangerousness is required to justify forced medication in the context of this case, or whether a finding of "grave disability" or other compelling circumstances would suffice. The law was not clearly established as to the substantive standards applicable to institutionalized incompetents who had been judicially committed for treatment at USH. Defendants reasonably concluded that the state policy in place since March 1993, which requires a showing of the threat of harm to self or others, or the alternative requirement of "grave disability," was lawful and appropriate.

* Under the "2/94" policy in effect from February 24, 1994 to date, USH physicians force medicated plaintiff and other institutionalized patients in accordance with the substantive and procedural policies and practices set forth therein, which in substance and effect were similar to those established in the "3/93 policy" except as to the distinction which existed before February 1994 as to patients with or without guardians. Under the "2/94 policy," USH physicians applied the same policy and procedures to patients with or without guardians, and exercised decisions concerning mental and medical treatment for patients who needed such. In one instance, on February 25, 1994, the instructions given by plaintiff's guardian to withdraw all medication was overridden by the medical committee which decision was upheld on appeal. Since the guardianship of plaintiff was terminated in July 1994 by state court order, involuntary medication hearings have proceeded as to plaintiff, as with other civilly committed patients, under the existing procedures and policies which require medical determination based upon compelling circumstances which must include dangerousness or "grave disability." Under such circumstances, defendants reasonably believed they were authorized to render such mental treatment and medication determinations where consent was refused by the patient or the guardian.

■ * A direct finding of dangerousness is not required in the context of this case if other compelling state interests exist which overbalance a plaintiff's interest in being free from unwanted forced medications. In *Riggins*, the Supreme Court suggested that dangerousness is not required if "other compelling reasons" exist. 504 U.S. at 136, 112 S.Ct. at 1816. This court rules that involuntary medication and treatment of patients who have "grave disabilities" constitutes such a compelling reason.

■ * The exercise of professional medical judgment, taking into account the medical best interest of the patient and accepted medical standards, may justify forced medication if compelling circumstances are found to exist, as in the context of this case. In *Youngberg*, the Supreme Court approved the exercise of professional judgment in determining restrictions upon "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests" with reference to an involuntarily committed (and severely mentally retarded) patient. 457 U.S. at 324, 102 S.Ct. at 2462. Likewise, the Tenth Circuit in *Bee v. Greaves*, declared that

> Any decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards. *Cf. Youngberg v. Romeo*, 457 U.S. 307, 321–23, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982).

744 F.2d 1387, 1396.

* Defendants have identified legitimate and rationally based state objectives and interests concerning the administration of forced medication to patients at USH. These are: (1) providing the judicially committed patient with necessary and adequate medical treatment and care; (2) providing a safe and orderly environment for the patient as well as other patients and preventing the likelihood of serious harm; (3) providing medication treatment for gravely disabled patients; and (4) enabling the patient to return to a state of mental health whereby he may be discharged from the USH. In each instance of forced medication in this case, one or more of these essential and compelling state interests overbalanced plaintiff's constitutional right to be free from unwanted medications.

Based upon the foregoing, this court rules that the statutes, policies and procedures which are presently in force and effect and applicable to the USH concerning forcible medication of persons civilly committed to the USH and adjudicated incompetent are valid, legal and not in violation of the laws or constitution of the United States. The aforesaid statutes, policies and practices set forth legitimate, rationally based and compelling state interests which when appropriately applied over-balance plaintiff's liberty interest not to be involuntarily medicated with antipsychotic drugs. Plaintiff has not shown that such violate substantive due process under the Fourteenth Amendment.

## C. PROCEDURAL DUE PROCESS

### 1. *In General*

The Supreme Court in *Harper* held that adequate procedural due process protections were afforded to a mentally ill prisoner who was forced to take antipsychotic drugs under a policy which required: (1) a hearing before a committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the Center, none of which could be presently involved in the prisoner/patient's treatment; (2) 24 hours' notice to patient prior to the hearing, setting forth the factual basis for the diagnosis and the reasons medication is necessary; (3) right of the patient to attend the hearing, to present witnesses, to cross-examine witnesses, and to have the assistance of a lay advisor; and (4) right to appeal the decision to the Superintendent of the Center and to seek judicial review. 494 U.S. at 215–17, 236, 110 S.Ct. at 1044, 1044–45.[59]

The Supreme Court in *Harper* found that "the Constitution does not prohibit the state

from permitting medical personnel to make the decision under fair procedural mechanisms." [60] Rejecting a judicial hearing as impracticable and unnecessary, the *Harper* court stated that

We cannot make the facile assumption that the patient's intentions, *or a substituted judgment approximating those intentions,* can be determined in a single judicial hearing apart from the realities of frequent and ongoing clinical observation by medical professionals. Our holding in Parham that a judicial hearing was not required prior to the voluntary commitment of a child to a mental hospital was based on similar observations:

"... [D]ue process is not violated by use of informal traditional medical investigative techniques ... The mode and procedure of medical diagnostic procedures is not the business of judges ..." Parham [v. J.R.,] 442 U.S. [584] at 607 [99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979)].

494 U.S. at 231–232, 110 S.Ct. at 1042 (emphasis added).

As to the requirement that such medical decisions must be made by an independent decision maker, the court stated

there is no indication that any institutional biases affected or altered the decision to medicate [the patient] against his will ... [and i]n the absence of evidence to the contrary, we are not willing to presume that members of the staff lack the necessary independence to provide a [patient] with a full and fair [determination]

*Harper,* 494 U.S. at 233, 110 S.Ct. at 1043. Additionally, the Supreme Court in *Harper* found that the requirements of due process were met by a policy that included 24 hours' notice before the hearing, with description of

---

**59.** In *Taylor v. Verville, supra* Fn. 52 at p. 4, the court adopted the same standards as applicable to persons involuntarily committed to an institution, stating that such persons would have substantially the same due process protections afforded an inmate, but that

because of the infancy of *Washington* it has not yet been determined whether those same due process protections afforded a prison inmate also apply to an involuntarily committed with respect to the forceful administration of medication.

**60.** *Harper* at 231, 110 S.Ct. at 1042. Previously, in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63

L.Ed.2d 552 (1980), the Supreme Court had upheld the involuntary transfer of a Nebraska state prisoner to a mental hospital, finding that the following minimum procedures were sufficient to protect the liberty interest at stake: (1) written notice; (2) a hearing disclosing the evidence relied upon; (3) an opportunity to be heard at the hearing and to present evidence and cross-examine witnesses; (4) an independent decision maker; (5) a written statement disclosing the basis for the fact finder's decision; and (6) the availability of legal counsel. *Id.* at 494–95, 100 S.Ct. at 1264–65.

the factual basis for the diagnosis, the right to attend the hearing, the right to present evidence and to question witnesses, and the right to have a lay advisor but not a lawyer present. Concerning the alleged right to legal counsel, the court said:

> "[I]t is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgment." *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 330, 105 S.Ct. 3180, 3194, 87 L.Ed.2d 220 (1985) (emphasis in original). Given the nature of the decision to be made, we conclude that the provision of an independent lay advisor who understands the psychiatric issues involved is sufficient protection.

494 U.S. at 236, 110 S.Ct. at 1044 (citations omitted).

### 2. *Procedural Policies and Practices at USH*

Defendants claim that USH policies and procedures in effect at all relevant times provided adequate due process protections, at least equivalent to those set forth in *Washington v. Harper.* Defendants further claim that in 1991, and thereafter, forced medication was administered only after a judicial commitment had occurred and it had been determined by exercise of medical judgment that compelling circumstances required such. Involuntary medication hearings were conducted in which a committee of professionals balanced a proposed determination to force medicate pursuant to one or more of the identified state interests as against the constitutional interest of the patient to be free from unwanted and involuntarily administer medication.

■ Plaintiff claims that the due process afforded a patient who refuses psychotic drugs under the USH policies is inadequate, and urges that past and present procedures be declared invalid. In this regard, plaintiff claims that his procedural rights were violated in the following respects during relevant time frames: (1) lack of independent decision maker because of participation by Clinical Director on appeals; (2) only 24 hours' notice before hearings; (3) prohibition of presence of patient's attorney at hearings; (4) lack of right to present evidence or witnesses because plaintiff was expelled from hearings; and (5) lack of informed consent/substituted judgment provisions, including guardian's right to make medication decisions.

This court rules that past procedures and practices as well as those which are now in effect pass constitutional muster and do not violate plaintiff's procedural due process rights essentially for the same reasons set forth in *Washington v. Harper.* In this regard:

* Plaintiff claims that his due process rights have been violated because Dr. Hummel was not an independent decision maker when he reviewed an appeal determination made at forced medication hearings. Plaintiff claims that this occurred in connection with his appeal from the forced medication hearing on October 2, 1991, and on one or more other occasion. In each instance, Dr. Hummel was the Clinical Director at USH, but was not Mr. Jurasek's treating physician. When Dr. Hummel acted on the identified occasions, it was under the USH policy which provided for forced medication in the event of an emergency,[61] and as such each constituted an isolated incident or emergency which was independent from his decision to uphold the committee decision to force medicate. USH adopted and complied with a policy which required that the members of the hearing committee could not be directly involved in a patient's treatment or diagnosis.[62] Dr. Hummel was not so involved. Plaintiff has not shown that Dr. Hummel lacked the necessary independence to provide a fair and full review, and this court is not willing to presume such.[63]

* Plaintiff claims that the 24–hour notification policy violates due process because it is

---

**61.** The USH policy in effect in October of 1991 and thereafter, when Dr. Hummel ordered forced medication, provided that patients could be treated under exigent circumstances when the patient is likely to cause injury to himself or others if not immediately restrained and subjected to treatment. Such emergency treatment could be administered for up to 24 hours, after which a regular involuntary medication hearing was to be held.

**62.** *See* Fn. 41, *supra.*

**63.** *See Washington v. Harper,* 494 U.S. at 233, 110 S.Ct. at 1043.

"impossible" to prepare for a substantial hearing with only 24 hours' notice. Consistent with *Harper*, this court finds that the USH 24–hour notification policy is not unreasonable and it adequately protects the due process rights of patients.

* Plaintiff claims that the USH policy which excludes a patient's lawyer from forced medication hearings is in violation of his due process rights. It is manifest, however, that a lay advisor who understands psychiatric issues is sufficiently and in fact better equipped than a lawyer to deal with the medical issues presented at such hearings. As ruled in *Harper*, and for the same reasons, this court finds that the USH policy which prohibits either the patient or the doctors from being represented by an attorney in the forced medication hearing is not violative of Mr. Jurasek's due process rights.[64]

* Plaintiff claims he was not provided an adequate opportunity to present evidence or witnesses or to cross-examine witnesses at his hearings because he was expelled from some of the hearings. However, the USH policy which provided for such was subject to the condition that if a patient becomes disruptive, he may be removed from the hearing.[65] This court finds that in each involuntary medication hearing plaintiff was provided the opportunity to present evidence and question witnesses. The USH regulation which placed the non-disruptive condi-

tion upon that right was and is reasonable and appropriate.

■ * Plaintiff insists that a court in a judicial hearing should decide whether an incompetent patient would have given informed consent to be force medicated. The Supreme Court in *Harper* rejected this approach as applied directly to a determination of the patient's intentions *or to "substituted judgment approximating" the patient's intentions*, stating that it would not make the "facile assumption" that such could be "determined in a single judicial hearing." 494 U.S. at 231, 110 S.Ct. at 1042 (emphasis added).[66] This court similarly rules that due process is not violated by the use of "informal, traditional medical investigative techniques" and "medical diagnostic procedures" which are not "the business of judges." *Id.* at 232, 110 S.Ct. at 1042.

■ * On the substituted judgment issue, plaintiff claims that defendants prevented his guardian from providing or withholding his informed consent, and from exercising substituted judgment. Manifestly, a patient's wishes as expressed through a duly appointed guardian should be considered and weighed by USH doctors at a medication hearing under procedures in place at USH. The guardian should be given notice of the hearing and the substituted judgment expressed on behalf of the patient should be given due consideration.[67] However, this

---

**64.** Plaintiff points to the Statement of Patients Rights adopted in May 1993 by USH which provides that patients "have the right to legal counsel and an attorney of their choice." Plaintiff's Motion for Partial Summary Judgment, Exhibit F, p. 2 para 8. This is a general statement of policy which assures access to legal counsel. It is not inconsistent with the specific policy which excludes lawyers from participating in involuntary medication hearings. Such hearings involve psychiatric issues as to which a lay adviser is more conversant. The patient has sufficient protection without a lawyer. *See Washington v. Harper*, 494 U.S. at 236, 110 S.Ct. at 1044.

**65.** The USH policy which was in effect at all times provided:
> If the patient or others become disruptive during the hearing, the chairperson shall have that individual(s) removed from the courtroom and the hearing shall continue in his/their absence.

Defs. Exhs. A, B & C. *See* Fn. 43, *supra*.

**66.** In *Mills v. Rogers*, the Supreme Court noted that a person who becomes incompetent does not

surrender his liberty interest but "remains entitled to have 'substituted judgment' exercised on his behalf." 457 U.S. at 301, 102 S.Ct. at 2449. Shortly after the Supreme Court had granted certiorari the Supreme Judicial Court of Massachusetts handed down *Guardianship Roe*, 383 Mass. 415, 421 N.E.2d 40 (1981), holding that a person has a protected liberty interest in " 'decid[ing] for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs.' " *Id.* 421 N.E.2d at 51, n. 9. *Roe* involved a noninstitutionalized, mentally incompetent person, and the court stated "that its decision was limited to cases involving noninstitutionalized mental patients." 421 N.E.2d at 42, 55, 61–62.

**67.** Substituted judgment by a guardian for an incompetent in Utah is authorized by statute for "medical or other professional care, counsel, treatment or service." UCA § 75–5–312(2)(c). *See* Fn. 36 and Fn. 40 *supra*.

court holds that such substituted judgment by a guardian can be overridden by USH physicians for compelling reasons in furtherance of the identified legitimate state objectives and interests in the manner heretofore described.[68]

* The court finds that during relevant times, even though formal notice of medication hearings most often was not given to the guardian, there was informal discussion with the guardian from time to time and she raised no objection or substitution of judgment concerning medication decisions of defendants until January 1994. The guardian was known by the USH doctors to be acting only as a friend and not as a person to make medical decisions. In the hearing on February 24, 1994, the guardian's substituted judgment expressing the purported wishes of plaintiff to refuse the medication in question was taken into account and properly overridden as not being in the best medical interest of plaintiff and not outweighing the legitimate and compelling state objectives and interests. Thereafter, the guardianship was terminated at the request of the guardian, with the approval of the state court. The court finds that defendants did not intimidate the guardian or force her to resign or withdraw. Her withdrawal as guardian was consistent with her conception all along that she was not responsible for medical decisions concerning plaintiff.

## II. QUALIFIED IMMUNITY

### A. GENERAL PRINCIPLES

■ Neither the Supreme Court nor the Tenth Circuit has directly ruled on the constitutionality of a forced medication policy or procedures relating thereto in the context of an institutionalized person committed pursuant to state law after a judicial hearing and determination of incompetence. The Supreme Court might have addressed the implications of antipsychotic drugs in such a situation in *Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16. However, the Court ultimately refrained from deciding "whether an involuntarily committed mental patient has a constitutional right to refuse treatment with antipsychotic drugs" because

"substantive and procedural issues [were] intertwined with questions of state law." [69]  *Id.* at 298–299, 102 S.Ct. at 2448.

Defendants—all officials at one time or another at the Utah State Hospital—have raised the defense of qualified immunity. Under that doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). Such knowledge is measured "in light of preexisting law" *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987).

The Tenth Circuit in *Watson v. University of Utah Medical Center*, 75 F.3d 569, 577 (10th Cir.1996) determined that once the defendant raises the defense of qualified immunity,

the plaintiff then has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right. (*Quoting Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir.1994)).

\*     \*     \*     \*     \*     \*

This burden is quite heavy ... for the plaintiff must do more than simply allege the violation of a general legal precept. The plaintiff must "instead demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." (*Quoting Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993)).

\*     \*     \*     \*     \*     \*

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* (*quoting Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039).

---

**68.**  *See* Fns. 15, 16, 18, 40 and 45, *supra.*

**69.**  *See* Fn. 66, *supra* and accompanying text.

To discharge the burden of proof, plaintiff must show that constitutional rights were violated and that the law was clearly established relative thereto. This court has ruled previously herein that plaintiff has not shown that constitutional rights have been violated. In any event the doctrine of qualified immunity applies because the law was not and is not clearly established in the context presented in this case.

## B. CLEARLY ESTABLISHED LAW

While the general proposition of law that a liberty interest exists in refusing unwanted psychotropic drugs was clearly established prior to 1991, the law was not clearly established and is not yet clearly established concerning the scope of due process as applied to a person who has been judicially committed to an institution under an adjudication of incompetence. The balance between the constitutional right and the state interests involved in that context has yet to be decided.

Justice Blackmun, concurring in *Harper*, regarded incompetence of mentally ill persons and civil commitment on account thereof as highly significant:

> Much of the difficulty will be lessened if, in any appropriate case, the mentally ill patient is formally committed. This on occasion may seem to be a bother or a nuisance, but it is a move that would be protective for all concerned, the inmate, the institution, its staff, the physician, and the State itself. It is a step that should not be avoided or neglected when significant indications of incompetency are present.

494 U.S. at 236–237, 110 S.Ct. at 1044–45 (citations omitted).

In *Bee v. Greaves*, 910 F.2d 686 (10th Cir.1990) the Tenth Circuit did not rule on the applicability of a Utah statute which au-

thorized involuntary medication of a mental patient in certain circumstances, because a judicial commitment proceeding had not been held pursuant to another Utah statute. The court recognized that *"without a hearing"* a mentally ill person has a right not to be "subjected to involuntary treatment." *Id.* at 688 (emphasis added). Similarly, in the original case of *Bee v. Greaves,* the Tenth Circuit recognized a substantial distinction between competent persons who are force medicated against their will and incompetent persons who have been judicially committed after findings by a court that rational decision making is lacking. 744 F.2d 1387, 1395 (10th Cir.1984).

In 1992 the Utah Legislature established conditions for involuntary treatment with medication (UCA 62A–12–234.1), but the statute was repealed as of May 2, 1994 for the purpose of permitting the establishment of procedures by hospital policy "since this area of the law is a rapidly evolving area." Laws 1994, ch.15, § 2.[70] The statute authorized forced medication if medical best interest of the patient in accordance with prevailing standards of accepted medical practice was shown, but did not require dangerousness as a necessary predicate for involuntary medication. In March 1993 a USH policy absent dangerousness consistent with the Utah law was struck down as applied to a pretrial detainee who had been committed to USH for treatment because he had been determined to be incompetent to stand trial. USH officials reasonably believed that such law or policy would be valid in the context of an institutionalized incompetent who had been judicially committed after a full hearing.[71]

The uncertainty of the law in this area is described in *Sherman v. Four County Coun-*

---

**70.** The statute in question from 1992 until 1994, authorized involuntary medication absent a finding of dangerousness based upon medical determinations. It provided:

> Based upon the court's findings, under Subsection 62A–12–234(10), that the patient lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment, as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment, the committee shall authorize

involuntary treatment with medication if it determines that:

> (a) the proposed treatment is in the medical best interest of the patient, taking into account the possible side effects as well as the potential benefits of the medication; and

> (b) the proposed treatment is in accordance with prevailing standards of accepted medical practice.

Utah Code Ann. § 62A–12–234.1 (1992).

**71.** *See* Fns 40 and 45 *supra.*

*seling Center,* 987 F.2d 397 (7th Cir.1993). In that case, the Seventh Circuit noted that several courts have "wrestled with the scope of a civilly committed patient's right to refuse medication," and concluded that the law was unclear. *Id.* at 408. The court reviewed several cases concerning forcible medication in other contexts,[72] and concluded that *"even today [in 1993] the scope of the Fourteenth Amendment is not clear in this area."* 987 F.2d at 409 (emphasis added) *See also Cochran v. Dysart,* 965 F.2d 649 (8th Cir.1992).

In *Washington v. Silber,* No. 92–7199, 1993 WL 188309 (4th Cir. June 2, 1993), the Fourth Circuit stressed the significance of a finding of incompetence made at a state court commitment proceeding. The court said:

> The state court found that Washington was "so seriously mentally ill as to be substantially unable to care for himself." The court made an equivocal finding-placing a check with a question mark on the form commitment order-about whether Washington was an "imminent danger to himself." The court ordered commitment for 180 days. In its order authorizing administration of medication "as required," the court found that Washington was "incompetent or incapable ... of giving informed consent."

*Id.* at \*1. The court went on to rule that a state ordered commitment to an institution after a full hearing constitutes a predicate for appropriate involuntary medication thereafter:

> The district court noted that the state of Virginia had done just what Justice Blackmun proposed here—it went through a formal judicial process to have Washington committed. The plaintiff in Harper was just an ordinary prisoner; in the eyes of the law he was fully competent. This

"competence" is what, in Justice Blackmun's opinion at least, made Harper a troublesome case. That the Court held that even a "competent" inmate may be medicated against his will if certain non-judicial procedural protections are provided ought not bestow additional rights on those who have been afforded a full, formal, adjudicatory process and a solemn, appealable, judicial finding.

*Id.* at \*3. The Fourth Circuit also ruled that dangerousness need not be specifically found to exist in the absence of a state statute requiring such.[73] In the case at bar the Utah statute identifies "grave disability" as an alternative to the dangerousness requirement for the administration of psychotropic drugs. It was and is reasonable for officials in the position of defendants to believe that "grave disability" constitutes a valid and compelling justification as relates to civilly committed, judicially determined incompetent persons.

As to whether the USH could substitute its judgment or override a guardian's decision not to medicate the patient, the USH officials reasonably believed that Utah law and judicial orders of commitment after a finding of incompetence empowered USH physicians to render mental treatment and require involuntary antipsychotic medication.[74] They were, of course, aware that the State of Utah by statute authorized the civil commitment of persons determined by the court, *by clear and convincing evidence,* to "lack the ability to engage in a rational decision making process regarding the acceptance of mental treatment ..." UCA 62A–12–234(10). The USH defendants reasonably believed that USH had been authorized by law, to act as a "surrogate" for such civilly committed per-

---

**72.** These included *Walters v. Western State Hospital,* 864 F.2d 695, 697–98 (10th Cir.1988) (committed patient); *Bee v. Greaves,* 910 F.2d 686 (10th Cir.1990) (pre-trial detainee); and *Rogers v. Okin,* 478 F.Supp. 1342, 1383 n. 58 (D.Mass. 1979) (civil patients), *aff'd in part and rev'd in part,* 634 F.2d 650 (1st Cir.1980)). The court concluded that "[n]o clear rules appear from these cases." *Sherman,* 987 F.2d at 408.

**73.** The court said:
The state court's order authorizing medication does not address Washington's dangerousness,

because the state statute does not require such a finding.
*Id.* at \*3.

**74.** *See* Fns. 15, 16, 18, 40 and 45. In the letter to the state court judge in support of termination of the guardianship of plaintiff USH Clinical Director Hummel articulated the rationale of USH as the entity to which such mental health care decisions had been delegated by the local mental health center. *See* Pl. Exh. 1, Fn. 39 and accompanying text.

sons who had been determined to be incompetent.

In 1990 in the case of *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990), the Supreme Court ruled that the State of Missouri was not required to accept the "substituted judgment" of close family members of a patient in a persistent vegetative state as to withdrawal of life-sustaining treatment, absent clear and convincing evidence that their views reflected the views of the patient.[75] The issue presented was "whether Cruzan has a right under the United States Constitution which would require the hospital to withdraw life-sustaining treatment from her under these circumstances," 497 U.S. at 268, 110 S.Ct. at 2846. The Court held that a state could apply a clear and convincing evidence standard where a guardian or some other "sort of surrogate" sought to exercise substituted judgment on behalf of another. The court stated:

> ... we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition. Petitioners [claim] that an incompetent person should possess the same right in this respect as is possessed by a competent person.... The difficulty with petitioners' claim is that in a sense it begs the question: *An incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right. Such*

*a "right" must be exercised for her, if at all, by some sort of surrogate ....* Missouri requires that evidence of the incompetent's wishes as to the withdrawal of treatment be proved by clear and convincing evidence. *The question, then, is whether the United States Constitution forbids the establishment of this procedural requirement by the State. We hold that it does not.*

497 U.S. at 279–280, 110 S.Ct. at 2852 (emphasis added, citations omitted). Justice O'Connor in a concurring opinion noted that the states must address and craft appropriate procedures to safeguard incompetents' constitutional interests.[76] Defendants reasonably believed that the State of Utah had appropriately established such measures.

This court finds that it was reasonable for officials of the USH to believe that based upon the policies and procedures in effect, and upon determination of compelling reasons therefor, they could act as a surrogate and force medicate institutionalized civilly committed patients without a guardian's consent, and that they could override the guardian's expressed substituted judgment where consent was refused.

It appears to this court that at all pertinent times the law regarding involuntary medication of a person civilly committed to the state mental hospital and adjudicated to be mentally incompetent was not clearly established. A reasonable institution and attending administrators and doctors therein in

---

**75.** In *Cruzan,* the daughter of the plaintiff parent guardians, Nancy Cruzan, was in a car accident and sustained severe injuries leaving her in a "persistent vegetative state" ("a condition in which a person exhibits motor reflexes but evidence no indications of significant cognitive function." 497 U.S. at 266, 110 S.Ct. at 2845.) The court considered her to be incompetent because of the injuries she sustained ("Cruzan was rendered incompetent as a result of severe injuries sustained during an automobile accident." 497 U.S. at 265, 110 S.Ct. at 2844.) Cruzan's parents sought a court order directing withdrawal of their daughter's artificial feeding and hydration equipment after it became apparent that she had virtually no chance of recovering her cognitive facilities.

**76.** Justice O'Connor stated:
Today's decision, holding only that the Constitution permits a State to require clear and convincing evidence of Nancy Cruzan's desire to have artificial hydration and nutrition withdrawn, does not preclude a future determination that the Constitution requires the States to implement the decisions of a patient's duly appointed surrogate. Nor does it prevent States from developing other approaches for protecting an incompetent individual's liberty interest in refusing medical treatment. As is evident from the Court's survey of state court decisions, ... no national consensus has yet emerged on the best solution for this difficult and sensitive problem. Today we decide only that one State's practice does not violate the Constitution; the more challenging task of crafting appropriate procedures for safeguarding incompetents' liberty interests is entrusted to the "laboratory" of the States, (citations omitted).
497 U.S. at 292, 110 S.Ct. at 2858–2859.

the position of defendants could not have known what standard of review applied and what substantive requirements were mandated when plaintiff was medicated during the period March 1991 to present. During that period of time the USH attempted to put in place policies and procedures in accordance with judicial pronouncements applicable in analogous but different contexts. The hospital was directed to establish policies regarding involuntary medication by a state court in accordance with *Harper*. Sometime later in 1991, the hospital began to develop new policies and procedures in the wake of *Taylor v. Verville*. In 1992, the USH was guided in part by a legislative enactment, but the hospital revised its policies in 1993 after the *Woodland v. Angus* case was handed down. In 1994 the Utah Legislature repealed the 1992 law in recognition of the "rapidly evolving area" of law. It appears to the court that the law continues to evolve and is not yet clearly established.

There is no evidence that the defendants in this case ever deliberately attempted to deny plaintiff's rights. Rather it appears clear that the USH and defendants in good faith attempted to shape policies and procedures to take account of court decisions as they were handed down. Accordingly, this court finds and rules that the actions of defendants in all instances were reasonable, and that a reasonable official would not have known or believed that such actions violated clearly established law.

Consistent with the preceding factual predicate and analysis, this court finds that in all instances where plaintiff was force medicated such was done after the exercise of professional medical judgment and that compelling reasons to do so were present. This court further finds and determines that in each instance where plaintiff was involuntarily medicated, such was done pursuant to a policy or practice reasonably related to one or more of the legitimate state objectives and interests above identified and that the said state objectives and interests as thus applied outweighed the constitutional right of plaintiff to be free from involuntary medication. It follows that defendants are not liable in damages or subject to injunctive relief because there was no constitutional violation. In any event, the doctrine of qualified immu-

nity applies because the law was not clearly established in the context applicable to this case. Accordingly, this court rules that medically ordered involuntary medication is justified at USH where a person has had a full hearing resulting in civil commitment, with appropriate findings as required by Utah law including a judicial determination of incompetence; *provided, however,* that thereafter USH physicians determine in an involuntary medication hearing that compelling circumstances require forced medication in the medical best interests of the patient, in accordance with accepted medical standards, and in accordance with involuntary medication policy and procedures at least equivalent to those adopted in the "2/94 policy."

Based upon the foregoing, it is hereby

ORDERED, that plaintiff's Motion for Partial Summary Judgment is DENIED; it is

FURTHER ORDERED, that plaintiff's Motion for Preliminary Injunction and for Permanent Injunction to require modification of Utah State Hospital policies and procedures concerning forced medication at Utah State Hospital is DENIED; it is

FURTHER ORDERED, that defendants' Motion for Summary Judgment is GRANTED; it is

FURTHER ORDERED, that defendants are granted qualified immunity with respect all claims asserted against them.

Under the circumstances presented in this case, no costs or attorneys fees are awarded to either side. The court finds that plaintiff acted in good faith in filing and prosecuting this action, and that he is unable to pay costs. Counsel for plaintiff was requested by this court to represent plaintiff pursuant to 28 USC § 1915 because plaintiff was unable to employ counsel.

Counsel for defendants are directed to prepare, serve and lodge with the court within 30 days a form of judgment consistent with this memorandum decision and order, after first complying with local rule 206(b).